120                    45 Mass. App. Ct. 120 (1998)

Coca-Cola Bottling Company of Cape Cod *v.* Weston & Sampson Engineers, Inc.

COCA-COLA BOTTLING COMPANY OF CAPE COD *vs.* WESTON & SAMPSON ENGINEERS, INC.

No. 95-P-1602.

Barnstable. April 14, 1998. - June 23, 1998.

Present: WARNER, C.J., GILLERMAN, & LAURENCE, JJ. ·

*Practice, Civil,* Directed verdict, Judgment notwithstanding verdict. *Repose, Statute of. Warranty. Negligence,* Construction engineer, Construction work, Comparative. *Contract,* Warranty.

General Laws c. 260, § 2B, a six-year statute of repose, was applicable to an implied warranty claim brought against an engineering firm, alleging professional malpractice in the design and construction of a wastewater treatment facility [124], and where the actions of the defendant engineering firm, in attempting to remedy defects revealed after the construction of the facility, qualified as "general administration" subject to the protections of that statute [124-126], the plaintiff was barred from bringing an action against the defendant more than seven years after the facility was "open to use" within the meaning of the statute [126-128].

In an action alleging breach of an express warranty in the design and construction of a wastewater treatment facility, the evidence was sufficient to present the case to the jury for decision. [128-129]

A new trial was required in a civil action where, of the two theories of liability on which the plaintiff proceeded, one theory would support the jury's verdict and the other, which was time-barred, was erroneously presented to the jury, and there was no way to ascertain on which theory the jury had relied. [129]

CIVIL ACTION commenced in the Superior Court Department on August 5, 1991.

The case was tried before *Cortland A. Mathers*, J.

*Warren D. Hutchison* for the defendant.

*Kirk Y. Griffin* for the plaintiff.

GILLERMAN, J. Coca-Cola Bottling Company of Cape Cod (Coca-Cola) brought an action against Weston & Sampson Engineers, Inc., on August 5, 1991, for breach of contract regarding the design and operation of Coca-Cola's wastewater

treatment facility in Sandwich. The defendant moved for summary judgment on the ground that Coca-Cola's claim was time-barred. While the motion for summary judgment was pending, Coca-Cola moved to amend its complaint in order to add additional counts for breach of implied and express warranties. On September 16, 1992, the defendant's motion for summary judgment was denied; the next day the motion to amend was allowed, and the case proceeded to trial on the amended complaint.

On May 17, 1994, a Barnstable County Superior Court jury returned a verdict for Coca-Cola in the amount of $293,000. The trial judge denied the defendant's motions for a directed verdict and for a judgment notwithstanding the verdict, and the defendant appealed.

1. *Facts.* There is no material disagreement as to what happened in this case (although *why* some of those events occurred often was left unexplained). In 1982, Coca-Cola moved its operations from Sagamore to a parcel of undeveloped land in Sandwich. Sandwich did not have a municipal sewerage system, and Coca-Cola was required to build its own wastewater treatment facility in conjunction with its new plant.

Coca-Cola began negotiations with the defendant in late 1982 for the design of the required facility in Sandwich. The parties subsequently signed four separate agreements regarding the consulting services that the defendant would provide to Coca-Cola.[1]

The defendant presented Coca-Cola with several designs for a wastewater treatment facility. Coca-Cola chose an aerated lagoon system which required lower initial costs but higher long-term operating costs. The wastewater treatment facility consisted of two lagoons, each ninety feet by 120 feet and twelve to fourteen feet deep, with heavy plastic liners and two infiltration areas. The waste that went into the system consisted of syrup, soapy/chlorinated water, product that fell below specifications, and oil and grease used to maintain machinery. Bacteria in the lagoons altered the composition of the waste so that the water could be safely released back into the ground.

Coca-Cola received the necessary groundwater discharge

[1]The four agreements introduced at trial were dated September 24, 1982; February 23, 1983; October 6, 1983; and July 20, 1984. The plaintiff does not rely on any of these agreements to support its claims.

permit (permit) on February 8, 1984, and the facility began operating on May 16, 1984. The permit contained various discharge limitations. By the fall of 1984, it became evident that the system was not functioning within those limitations. The system failed to keep the levels of "Biochemical Oxygen Demand" (BOD),[2] suspended solids, settleable solids, waste oils, phosphorous, and coliform within the limits specified in the permit. Although there were periods of time when some of the levels were within the permit limits, there was never a time when all of the levels met the permit requirements.

On March 6, 1985, the Department of Environmental Protection (DEP)[3] informed Coca-Cola that a review of Coca-Cola's monthly self-monitoring reports for the period of September, 1984, through January, 1985, showed "serious violations" of permitted discharge levels with respect to BOD's and suspended solids at the wastewater treatment facility. The DEP report also showed "violations" in total coliform levels for three months of the reporting period. On June 21, 1985, the DEP filed a civil enforcement proceeding against Coca-Cola for its permit violations and for an illegal discharge of wastewater onto an adjoining parcel of land.

The defendant implemented a number of modifications between 1985 and 1989 in an attempt to make the system operate properly. "Surface aerators" were added to augment the submersed air system that had originally been installed.[4] A "baffle" was added to the second lagoon in an attempt to address a continuing suspended solids problem. Supplemental air lines were also added to each lagoon. A spill plan was added, and a bacterial augmentation program was implemented. A biological reactor was set up on site. Nutrient levels and "pH" requirements were also frequently adjusted over the years.

None of the implemented modifications succeeded in making the system operate within permit limits. Coca-Cola closed the

[2]"BOD" is a measure of how much oxygen it takes in order to purify a waste. The higher the concentration of BODs, the more oxygen it will take to treat the waste.

[3]Formerly the Department of Environmental Quality Engineering (DEQE).

[4]Coca-Cola claims that after the wastewater treatment facility opened for use, the defendant provided numerous assurances that the system "would work" if some modifications were made. These allegations form the basis of Coca-Cola's claim of a breach of the defendant's express warranty, discussed *infra.*

45 Mass. App. Ct. 120 (1998)                                    123

Coca-Cola Bottling Company of Cape Cod *v.* Weston & Sampson Engineers, Inc.

wastewater treatment facility in November, 1989,[5] and the defendant's relationship with Coca-Cola was also terminated. Coca-Cola ceased production, purchased product elsewhere, and became a distributor. Coca-Cola later settled the DEP suit related to its various permit violations. A consent judgment entered in 1990, and Coca-Cola paid a $200,000 fine. Coca-Cola resumed production in June, 1991, and chose a new wastewater management system developed by another company. Coca-Cola now has its wastewater taken by a tank truck to an outside facility so that the water can be properly treated.

Count I of Coca-Cola's amended complaint alleges that the defendant failed to design, construct, and operate a functional and complete wastewater treatment facility as required by its contract. The judge did not instruct on this count, and Coca-Cola makes no claim under it. Count II alleges the breach of an implied warranty for a particular purpose, see G. L. c. 106, § 2-315. Count III alleges a breach of the express warranty, G. L. c. 106, § 2-313, that the wastewater treatment facility would treat wastewater within permit requirements.[6]

The standard of review for the defendant's motions for a directed verdict and for judgment notwithstanding the verdict is the same: "Does the evidence, construed against the moving party, justify a verdict against him?" *D'Annolfo* v. *Stoneham Hous. Authy.*, 375 Mass. 650, 657 (1978). See *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 706 n.3 (1990). There were also extensive objections by the defendant to the judge's charge, both as to the instructions given and as to what was omitted from the instructions. As to these claims, we determine if there was error, and, if so, whether the error af-

[5]Coca-Cola closed the wastewater treatment facility at this time because it was informed by the DEP after a final hearing that its permit would not be renewed.

[6]Coca-Cola's citations to the Uniform Commercial Code (UCC) have no application to this case, which involves the provision of professional services. We will treat Count II (as did the judge in his instructions to the jury) as an "implied[] promise to exercise that standard of reasonable care required of members of . . . [the defendant's] profession," *Klein* v. *Catalano*, 386 Mass. 701, 719 (1982); in other words, a professional malpractice claim. *Id.* at 719 n.18. (Contrast *Cambridge Plating Co.* v. *Napco, Inc.*, 991 F.2d 21 [1st Cir. 1993], [decision after remand 85 F.3d 752 (1st Cir. 1996)], a suit against the *seller* of a wastewater treatment system — that agreed to provide engineering and installation services in addition to a sale of goods — involved a mixed contract and therefore was governed by the UCC.)

124        45 Mass. App. Ct. 120 (1998)

Coca-Cola Bottling Company of Cape Cod *v.* Weston & Sampson Engineers, Inc.

fected the substantial rights of the defendant. Mass.R.Civ.P. 61, 365 Mass. 828 (1974).

2. *Coca-Cola's implied warranty claim: the application of G. L. c. 260, § 2B.* The defendant argues that Coca-Cola's implied warranty claim was barred by the statute of repose, see G. L. c. 260, § 2B, as appearing in St. 1984, c. 484, § 53, which provides in pertinent part:

> "Action *of tort* for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property, . . . shall be commenced only within three years next after the cause of action accrues; provided, however, that in no event shall such actions be commenced more than six years after the earlier of the dates of: (1) *the opening of the improvement to use*; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner." (Emphases added.)

Coca-Cola responds that the statute of repose does not apply here because its claim against the defendant is essentially a contract action, not a tort action. We disagree.

Coca-Cola's implied warranty claim is, in substance, a claim of professional malpractice — a negligence claim. Note 6, *supra*. See *Klein* v. *Catalano*, 386 Mass. 701, 719 (1982). To treat a claim for professional malpractice as a contract action because of the warranty label would defeat the repose provision which strikes "a balance between the public's right to a remedy and the need to place an outer limit on the tort liability of those involved in construction." *McDonough* v. *Marr Scaffolding Co.*, 412 Mass. 636, 643 (1992). Because Coca-Cola's implied warranty claim is based in tort rather than in contract,[7] it is subject to the provisions of the statute of repose. See *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engrs., Inc.*, 396 Mass. 818, 823 (1986) (in determining whether the statute of repose applies to a claim, the court must look to the "gist of the action").

Coca-Cola also argues that the statute of repose does not bar

---

[7] The negligence, according to Coca-Cola's brief, is that there was a "breach of professional duty owed to Cola-Cola," namely, an "improper design base" for Coca-Cola's plant, and thereafter a continuous failure "without interruption for over five years after May [16], 1984 [the date the plant first opened for use] to resolve the problem."

its professional malpractice claim because it did not discover that the defendant could not make the system work properly until it terminated its relationship with the engineering firm in 1989. There is no merit to the argument. A statute of repose such as G. L. c. 260, § 2B, sets the outer time limit for bringing an action. "Simply put, after six years, the statute completely eliminates a cause of action against certain persons in the construction industry." *Klein* v. *Catalano*, 386 Mass. at 702.

Thus, "[s]ection 2B, in its statute of repose aspect, forbids [courts] from considering the fact that a plaintiff did not discover or reasonably could not have discovered the harm before the six-year period of the statute of repose expired." *Sullivan* v. *Iantosca*, 409 Mass. 796, 798 (1991). The statute also bars courts from "considering circumstances that might have tolled the running of a statute of limitations." *Ibid.* See *Tindol* v. *Boston Hous. Authy.*, 396 Mass. 515, 517-518 (1986).

Coca-Cola argues that, even if the statute of repose is applicable to its professional malpractice claim, the claim is not time-barred because the statute did not begin to run on May 16, 1984, as the defendant claims. This is so, Coca-Cola argues, because the wastewater treatment facility was not "substantially completed" when the facility "started up" on May 16, 1984, and was never substantially completed within the meaning of G. L. c. 260, § 2B. Coca-Cola ignores the plain language of the statute of repose which states that no action may be brought more than six years after the earlier to occur of "(1) the opening of the improvement to use; *or* (2) substantial completion of the improvement" (emphasis added). G. L. c. 260, § 2B. Thus, the question whether an improvement has been substantially completed is immaterial to the determination of the date on which the statute of repose begins to run if the improvement has already been opened to use.

Coca-Cola conceded in its brief and in open court during oral argument on appeal that the wastewater treatment facility was open to use on May 16, 1984. May 16, 1984, is therefore the date on which the six-year statute of repose began to run on the professional malpractice claim.

There is an additional difficulty that must be discussed; it arose in the judge's charge. The judge, proceeding on a theory that is not clear from the record before us, instructed the jury that they could consider any negligent act of the defendant which occurred on or *after* August 5, 1985. The judge computed

the time *backward* six years from the date that suit was brought, August 5, 1991.

The error was in failing to recognize that the repose aspect of § 2B is *not* activated by the accrual of a cause of action. *Klein v. Catalano*, 386 Mass. at 702 ("A statute of repose . . . limits the time within which an action may be brought and is not related to the accrual of any cause of action"). The six-year period of § 2B begins on the earlier to occur of the opening of the improvement for use or substantial completion of the improvement. *Tindol* v. *Boston Hous. Authy.*, 396 Mass. at 517. In this case, the judge could have elected either to count forward from May 16, 1984 (the opening date), to the date of suit, or backward from the date of suit for six years, but if, in either event, the defendant's activities fall within the protection of § 2B, and the expired period is greater than six years, the action is barred.

The pivotal question, then, is whether the defendant's activities (assuming those activities were not justified by the standards of the engineering profession) fell within the protection of § 2B. More particularly, the question is whether the defendant's postopening professional activities qualified as "general administration" of the plaintiff's plant.[8]

The phrase, "general administration of an improvement to real property," G. L. c 260, § 2B, appears not to have been previously considered by an appellate court in this jurisdiction, nor have we succeeded in finding relevant authority in other jurisdictions. We must consider the phrase in the context of the provisions of the entire section, and in the light of the purposes sought to be achieved by the Legislature. See *Commissioner of Rev.* v. *Dupee*, 423 Mass. 617, 620 (1996).

Section 2B contemplates the occurrence of three phases to any improvement to real property: the design phase, the construction phase, and the administration phase following the completion of construction. G. L. c. 260, § 2B. The purpose of the third phase is to remedy design or construction problems which may, and frequently do, emerge following construction. The Supreme Judicial Court explained in *Klein* v. *Catalano, su-*

---

[8]The defendant's design of the plant necessarily occurred before May 16, 1984, and any claim for negligent design asserted in this 1991 action was clearly barred by § 2B. Thus we discuss the plaintiff's claim of professional malpractice only in so far as it relates to the defendant's postconstruction activities.

*pra* at 718: "engineers . . . and other [professionals] deal in somewhat inexact sciences and are continually called upon to exercise their skilled judgment in order to anticipate and provide for random factors which are incapable of precise measurement. The indeterminable nature of these factors makes it impossible for professional service people to gauge them with complete accuracy in every instance."

If, in this case, we were to construe § 2B so as to withdraw the protection of the statute in the face of uninterrupted, post-construction professional activities which the defendant performed in an effort to remedy unsatisfactory conditions that were revealed postconstruction, see note 7, *supra,* we would deprive the words "general administration of an improvement to real property," G. L. c. 260, § 2B, of any valuable meaning; that is, we would defeat a purpose of the section — to protect those engaged in the frequently occurring third phase of any construction project.[9] That being so, negligent acts of general administration that are prompted by defects in the construction of an improvement to real property and which seek to bring the project to the desired state, do not fall outside the repose aspect of § 2B. The acts may constitute professional malpractice, but if suit is not brought before the earlier to occur of (i) three years from the accrual of the cause of action, or (ii) six years from the earlier to occur of the opening of the plant or its substantial completion, then the action is barred.

Of course there are limits to what may be "general administration" for purposes of § 2B. The plumber who negligently repairs a plugged soil line long after the last punch list was satisfied and all professionals paid and released is not engaged in the "general administration of an improvement to real property" within the meaning of the statute, and he will not have available the protection of the repose aspect of § 2B. But that is not this case. Here, the owner never accepted the plant; and here, the defendant never ceased its efforts to remedy the unceasing difficulties that arose in the operation of the plant virtually from the day it opened for use. It is not disputed that the defendant's efforts after May 16, 1984, continued "without interruption for over five years." See note 7, *supra.* These ongoing efforts to complete the plant to the satisfaction of the owner

---

[9]The plaintiff makes no claim that any postopening work by the defendant constituted an "independent" improvement to real property so that the six-year statute of repose would begin to run anew.

constituted the third phase of the project — its general administration — however extenuated and unavailing that phase may have been. This works no hardship to Coca-Cola; it was fully aware of the continuing wastewater problem for six years without asserting a claim that the defendant was at fault. The Legislature has decided that, in matters involving the construction industry, six years is long enough.

The defendant is entitled to the protection provided by § 2B, and the plaintiff's professional malpractice claim is barred.[10] The judge erroneously denied the defendant's motion for a directed verdict on count II of the amended complaint, and the professional malpractice issue was erroneously given to the jury.

4. *Breach of express warranty.*[11] The claim for breach of an express warranty, an action in contract, is not governed by the statute of repose set forth at G. L. c. 260, § 2B. *Klein* v. *Catalano*, 386 Mass. 701, 708 (1982). What differentiates the promise implied by law discussed in the preceding section and an express warranty is that the "standard of performance is set by the defendants' promises, rather than imposed by law." *Anthony's Pier Four, Inc.*, v. *Crandall Dry Dock Engrs., Inc.*, 396 Mass. at 822. More specifically, an express warranty promises that a specific result will be achieved — in contrast to a promise implied by law — namely, that the work of the professional conforms to the standards of his or her profession. This distinction, easily articulated, can be worrisome to apply. See, e.g., *Clevenger* v. *Haling*, 379 Mass. 154 (1979) (Quirico, J., dissenting, with whom two justices joined).

Coca-Cola argues that the defendant expressly warranted that the wastewater treatment facility would ultimately treat wastewater within the permit requirements. While the issue is close, we conclude that there was sufficient evidence to present the question to the jury.

---

[10]In view of our conclusion that the plaintiff's professional malpractice claim is barred, we need not discuss the apparently meritorious argument of the defendant that there was no expert testimony sufficient to put to the jury the question whether *any* of the defendant's activities fell below the required professional standard.

[11]An express warranty claim has generally been understood to be based in contract rather than in tort. *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engrs., Inc.*, 396 Mass. 818, 822 (1986). Thus, unlike the claim for breach of an implied warranty, Coca-Cola's express warranty claim is subject to the six-year contract statute of limitations, G. L. c. 260, § 2, as opposed to the statute of repose. *Id.* at 822-824.

The problem at hand was the continuing difficulty of making the plant comply with the permit limitations regarding the discharged water. John Kayajan, the principal of Coca-Cola, in response to the question whether the principal representative of the defendant, Steven Corr, "ever indicate[d] to you that he could make the system operate within the permit specifications as a result of these modifications?" testified, "Well, that was the intention from the start, and there were times along the way when I asked Mr. Corr if — you know, if this was the right system or if we should try another route. Was this system really going to work? And I was assured time and time again that this system would work; and that there was no need to try something drastically different. . . . [H]e assured me that this system was proper; *that it would work.*"[12] (Emphasis added.)

Given the ongoing problem of complying with the permit requirements and the fact that the cure to that problem was at the center of everyone's attention, Kayajan could reasonably have understood the statements of the defendant's representative to mean that the requirements of the permit would be met. See *Alcan Aluminum Corp.* v. *Carlton Aluminum of New England, Inc.*, 35 Mass. App. Ct. 161, 167 (1993). Contrast *Clevenger* v. *Haling, supra.* True, other testimony by Kayajan on cross-examination was, as the defendant points out, less than promissory in nature, but the jury could have disregarded that testimony.

The defendant also challenges the sufficiency of the evidence that the defendant's services caused Coca-Cola's damages. While the evidence on this issue was certainly not overwhelming, it seems clear enough to us that — assuming a breach of the express warranty — the five-year effort of the defendant to solve the permit problem put the plaintiff to extra expenses.

The result is that there must be a new trial. Since the professional malpractice theory should not have been presented to the jury and the express warranty theory could have provided the necessary support, "we cannot ascertain on which theory the jury relied, [and] the verdict cannot stand." *Davis* v. *Allard*, 37 Mass. App. Ct. 508, 514 (1994), and cases cited.

At the retrial, the judge needs to make it plain to the jury that, in the event that they determine that the statements were

---

[12]Coca-Cola's brief does not, by reference to the record, identify any date for the statements attributed to Corr. Obviously the dates are material facts in the controversy.

made, they must choose whether (i) the plaintiff's reasonable understanding of the defendant's statements was that the defendant *promised* that its postconstruction work *would* bring the discharge water within permit limitations, or whether (ii) the plaintiff's reasonable understanding of the defendant's statements was that the defendant's work conformed to professional standards and therefore, in the opinion of the defendant, such work *should* bring about the desired result, in which event there would be no recovery.

There remains one issue that will likely arise at the retrial of the case: whether evidence of the plaintiff's contributory negligence is an absolute bar to its contract claim, as the defendant argues. The judge instructed on the comparative negligence statute, and the defendant argues that was error. Because the statute of repose eliminated any cause of action for professional malpractice, any instruction on comparative negligence at a retrial would be in error.

Claims based on breach of implied warranty, such as G. L. c. 106, § 2-315, being actions for strict liability, are beyond the reach of the comparative negligence statute, G. L. c. 231, § 85, although such claims sound in tort. *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 353 (1983). To the extent that the plaintiff's claim sounds in negligence, however, the comparative negligence statute may apply, and the plaintiff's own negligence may reduce or defeat the claim. *Fernandes* v. *Union Bookbinding Co.*, 400 Mass. 27, 37 (1987); *Flood* v. *Southland Corp.*, 416 Mass. 62, 65 (1993). Coca-Cola's surviving claim is based on express warranty and thus sounds in contract, see note 11, *supra*; the gist of the claim is the breach of the defendant's promise to the plaintiff regarding the result to be achieved. Like the statute of repose discussed above, which only applies to "action of tort," G. L. c. 260, § 2B, the comparative negligence statute applies only to any action "to recover damages for negligence." G. L. c. 231, § 85, as appearing in St. 1973, c. 1123, § 1. The comparative negligence statute does not apply to Coca-Cola's express warranty claim. Because the jury should not have been instructed on the professional malpractice claim, the judge's instructions were in error.

The judgment is reversed. Judgment shall be entered for the defendant on count I and count II of the amended complaint.

The case is remanded to the Superior Court for further proceedings, consistent with this opinion, under count III.

*So ordered.*