AGRI–MARK, INC. and The Travelers Indemnity Company, Plaintiffs,

v.

NIRO, INC., Defendant.

No. CIV.A. 99–30120–KPN.

United States District Court,
D. Massachusetts.

Feb. 1, 2002.

Sean P. Carter, A. Richard Bailey, Martin P. Duffey, Cozen and O'Connor, Philadelphia, PA, Stuart G. Blackburn, Blackburn & Sistare, Springfield, MA, Justin B. Wineburgh, Elaine M. Rinaldi, Cozen and O'Connor, Philadelphia, PA, for Plaintiff.

Michael S. Appel, Sugarman, Rogers, Barshak & Cohen, Boston, MA, Philip J. Callan, Jr., Michael K. Callan, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, for Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 65) and DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY AND FOR SUMMARY JUDGMENT (Docket No. 69)*

NEIMAN, United States Magistrate Judge.

This action arises out of two failures of an industrial milk evaporator owned and operated by Agri–Mark, Inc. ("Agri–Mark"). Agri–Mark and its subrogee, The Travelers Indemnity Company ("Travelers") (collectively "Plaintiffs"), allege that modifications to the system made by defendant Niro, Inc. ("Niro") caused the failures. The parties have consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c), and, pursuant to Fed.R.Civ.P. 56, Niro has filed two separate motions for summary judgment. For the reasons indicated below, the court will deny both motions.

### I. *SUMMARY JUDGMENT STANDARD*

A court may grant summary judgment pursuant to FED. R. CIV. P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.*, 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

### II. *FACTUAL BACKGROUND*

The following background is taken directly from the statement of material facts presented by Plaintiffs (Docket No. 74, hereinafter "Pls.' Facts"), the parties against whom summary judgment is sought. *See Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993) (indicating that, at summary judg-

ment, the record is viewed in the light most favorable to nonmoving party).

## A. AGRI–MARK AND ITS EVAPORATOR SYSTEM

Agri–Mark is an incorporated consortium of dairy farmers which operates a powdered milk production plant in West Springfield, Massachusetts. The products produced by Agri–Mark at the plant include condensed and powdered non-fat dry milk. Agri–Mark processes thousands of gallons of milk per day.

Agri–Mark utilizes an evaporator system to convert skim milk into dried milk by removing water from skim milk feed stock. The evaporation process is initiated by removing the cream from the whole milk. Next, the skim milk is pumped into the evaporation system where it falls by gravity in a thin film over heat exchanger surfaces. The heat exchangers remove the moisture from the skim milk product by transferring heat to the falling product film. The skim milk concentrate is then dried into a powder through the use of drying equipment.

The evaporator system used by Agri–Mark is a single pass mechanical vapor recompressor ("MVR") falling film evaporator. The system was originally sold, designed and installed by Weigand Evaporators, Inc. in late 1983. The total price of the system was $1,700,000. As installed, the evaporator consisted of three stages, also known as effects, and a fourth stage finisher. The system utilizes the MVR to provide heat to the first three effects and a high concentrator ("hicon") to heat the finisher.

Each evaporator effect utilizes a separator to separate the liquid milk from the water that has been vaporized. The purpose of the separator is not only to ensure that all milk solids are captured, but to prevent the liquid droplets in the vapor stream from penetrating into the compressor. While there is always a detectable level of liquid in the vapor stream, an excessive amount of carryover is detrimental to the system as it may cause erosion of the MVR impeller blades.

The third effect evaporator separator is referred to as the "safety separator," and its purpose is to intercept the liquid droplets and protect the MVR impeller from liquid impact. The MVR impeller operates at a tip speed in excess of 1,100 feet per second, or 750 miles per hour. Water droplets entrained in the vapor stream can have an impact on the impeller blades of a force similar to that generated by a solid projectile. The third effect was intended to protect the MVR impeller from this liquid impact.

## B. AGRI–MARK AND NIRO IN 1992

In early 1992, Agri–Mark contacted Niro, a company specializing in the sale, design and construction of evaporators, and inquired into the possibility of increasing the capacity of the evaporator system. After discussions, Agri–Mark, in March of that year, issued a purchase order in the amount of $30,000 for Niro to perform pre-engineering services to ascertain the feasibility of such a project. (*Id.*) Artur Zimmer ("Zimmer"), Niro's then President, performed an engineering analysis and developed a concept and budget to attempt to complete the modification and expansion of the Agri–Mark evaporator.

On June 15, 1992, Niro submitted its proposal to Ken Walley ("Walley"), Agri–Mark's chief project engineer. In essence, Niro proposed a "hybrid-type" expansion of the system which would expand the skim feed rate capacity of the evaporator in two phases. The first phase would increase the capacity from the existing 110,000 pounds per hour to 125,000 pounds. The second phase would increase the ca-

pacity from the 125,000 pounds to a final feed rate of 150,000 pounds per hour. The overall concept of the project was to add additional heat sources to the existing heat exchange surfaces. The cost of modifying the evaporator system was $395,000, plus $35,000 for its installation. On October 6, 1992, Walley issued a purchase order authorizing Niro to furnish the "[e]ngineering and all necessary hardware to complete the expansion of [sic] Agri–Mark evaporator from 110,000 [pounds per hour] skim feed to 150,000 [pounds per hour] skim feed," and the "[l]abor for erection and start-up." (Pls.' Facts at 5–6.)

To complete the first phase of the modification project, Niro utilized the existing heat exchangers and altered the heating mode of the finisher. This acted as a "pre-booster" to provide an early increase in capacity to meet Agri–Mark's immediate needs. To accomplish the second phase, Niro installed a low speed centrifugal compressor, known as a turbofan, into the suction line of the existing MVR. The turbofan would increase the overall compression ratio of the mechanical vapor recompression system, adding additional heat to the system to facilitate the capacity increase without requiring additional heat exchange surface area.

The modifications also required the integration of a thermal vapor recompressor heating mode for the hicon. This permitted the final effect of the evaporator to process the increased evaporation and reduced concentration of the product exiting the pre-evaporator due to the overall capacity increase. In addition, Niro was to complete other minor modifications to facilitate the increased amount of product flow through the system.

Niro expected that, as a result of the modification, there would be an increase in vapor production, but it believed that the system would continue to operate within the acceptable original design tolerances and without any adverse effects. Accordingly, Niro did not make any modifications to the system to account for the increased vapor flow. At no time did Niro advise Agri–Mark of its concern for the possibility of excess liquid carryover or increased erosion of the MVR as a result of modifying the evaporator system.[1]

## C.  DECEMBER OF 1992 THROUGH 1995

By December of 1992, Niro had installed nearly all of the hardware necessary to achieve the contracted rate of 150,000 pounds per hour, but it failed to do so when tested during Christmas week. The drive motor installed by Niro for the turbofan was also incompatible with the motor for the MVR, leading to further problems with the operation of the system. Agri–Mark refused to make any further payments to Niro until the system achieved its expanded capacity.

On October 27, 1993, Zimmer, although no longer President of Niro, sent a memorandum to Bo Bjarekull, Niro's engineer in charge of validating and testing the system, setting a protocol to complete the Agri–Mark project. Zimmer suggested that he and Bjarekull meet at the Agri–Mark facility, perform an analysis of the system, complete the modification and expansion project and resolve the outstanding payment issues.

Throughout 1994, Niro sought the reason behind the system's failure to achieve the contractual capacity rate. While the system had achieved an increase of ten or twelve thousand pounds per hour, it did

1. It was not until 1998, after the failures that are the subject of this litigation, that recommendations were made for further modifications to account for the increase in liquid carryover.

not achieve any additional capacity increases to satisfy the specifications for the second phase of the expansion project.

In early 1995, approximately two years after Zimmer and Bjarekull set the protocol to complete the expansion project, the parties settled their contractual dispute. As part of that resolution, Niro agreed to test the capacity of the system, complete the validation process and demonstrate that the system was able to achieve the contractual rate, after which Agri–Mark agreed to pay the balance of the contract price. It was this capacity evaluation, completed in February of 1995, that served as the validation of the system for compliance with the proposal and the completion of the contract.

D. THE FAILURES

On May 26, 1997, during a routine procedure, the MVR experienced high vibrations and was shut down. When the MVR was restarted, it seized violently. An examination of the MVR revealed that the impeller had struck its casing, thereby abrading, bending and cracking the impeller blades. A spare impeller newly manufactured by Turbotechnology Services Corporation ("TSC") was installed during the repair process and the repaired MVR was returned to service on June 21, 1997.[2]

The MVR ran without incident until February 15, 1998, at which time increasing vibrations were noted once again. On February 18, 1998, after a thorough cleaning, the MVR experienced a second shutdown. An inspection revealed two cracked impeller blades, along with significant ero-

sion. The impeller was sent to TSC for repairs, and the MVR was placed back online on March 3, 1998.

After the second failure, Agri–Mark again attempted to ascertain the cause of the failures, believing that the significant modifications made to the system by Niro from 1992 to 1995 may have resulted in unacceptable levels of carry-over of product and cleaning materials into the MVR. In March of 1998, Agri–Mark contacted Niro to determine a method to decrease the amount of liquid carryover from the evaporator effects into the MVR. Niro suggested the installation of a mechanical demister, an option that Agri–Mark rejected.

In a continuing attempt to reduce the amount of liquid carryover into the MVR, AgriMark contacted Zimmer. Zimmer determined that the safety separator was stressed beyond its capabilities by the increased vapor flow and velocities from the third effect and hicon as a result of the increase achieved in February 1995. Accordingly, Zimmer recommended increasing the size of the vapor windows between the heat exchangers and their separators, thus decreasing the velocity of the vapor stream and reducing its tendency to entrain moisture. The modifications suggested by Zimmer were completed in September 1998, and the system has operated since that time without incident.

III. PROCEDURAL BACKGROUND

Agri–Mark filed its complaint on June 10, 1999. On January 18, 2000, the court compelled Travelers to join as a plaintiff.

---

2. When the MVR was shut down to allow TSC to measure the old impeller, it was discovered that the impeller had severely eroded. Moreover, two casting cracks were found on the impeller. One of the cracks was eliminated by grinding away the erosion, and the second crack was contained by stop-drilling a hole perpendicular to the line of the crack to prevent propagation. The remainder of the impeller was trimmed and rebalanced. TSC had been another defendant in this action, but was voluntarily dismissed on April 4, 2001. (See Docket No. 61.)

Plaintiffs' amended complaint, filed on February 14, 2000, consists of three counts: negligence (Count I), breach of warranty (Count II) and breach of contract (Count III). Niro answered the amended complaint on February 18, 2000, and filed an amended answer and a counterclaim, sounding in breach of contract, on March 1, 2001.

Niro has filed two motions for summary judgment. The first sets forth two arguments: (1) that all of Plaintiffs' claims are barred by the applicable Massachusetts statute of repose, Mass. Gen. L. ch. 260, § 2B; and (2) that, in any case, Plaintiffs' claims must fail because of specific contractual language limiting damages. Niro's second motion for summary judgment seeks to exclude the proposed testimony of Plaintiffs' only expert, R. Dean Harris, pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The court will address each motion in turn.

## IV. NIRO'S FIRST MOTION FOR SUMMARY JUDGMENT

With regard to the primary motion for summary judgment, the court will first consider whether Mass. Gen. L. ch. 260, § 2B bars all of Plaintiffs' claims, as Niro argues. It will then turn to Niro's contractual limitations argument.

### A. STATUTE OF REPOSE

The statute of repose at issue here states as follows:

> [An a]ction of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property ... shall ... be commenced [no] more than six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2)

substantial completion of the improvement and the taking of possession for occupancy by the owner.

Mass. Gen. L. ch. 260, § 2B. The purpose of the statute is "to protect providers of 'individual expertise' ... who render particularized services for the design and construction of particular improvements to particular pieces of real property." *Dighton v. Fed. Pac. Elec. Co.*, 399 Mass. 687, 506 N.E.2d 509, 515 (1987).

Preliminarily, Niro contends that its function as a provider of engineering design services, as well as its role in the installation of the modification, places it within the class of actors protected by the statute of repose. Plaintiffs do not challenge this contention for purposes of the motion. Plaintiffs also concede for purposes here that, as Niro asserts, their claims sound in "tort," thereby coming under the rubric of the statute, were it found otherwise applicable.

Niro's remaining argument with respect to the statute of repose proceeds in two steps. First, Niro asserts that the modification to increase the capacity of Agri–Mark's evaporator system in 1992—particularly the installation of the turbofan by December of 1992—constituted an "improvement to real property" within the meaning of the statute. Plaintiffs disagree, calling the modification merely a "mechanical upgrade." Second, Niro argues that Plaintiffs failed to bring this action within six years of December of 1992, the month when the alleged improvement was either "open[ed] ... to use" or "substantial[ly] complet[ed]." In response, Plaintiffs contend that, even if the modification were an improvement, the measuring date for statute of repose purposes is not December of 1992, but February of 1995 at which time Niro completed the upgrade and the evaporator system produced the contracted-for increased capaci-

ty. The court will consider each issue in turn.

### 1. Was the 1992 Modification an Improvement to Real Property?

There is superficial merit to Plaintiffs' response to the first issue, whether the 1992 modification constituted an "improvement to real property." At first blush, Niro's mechanical upgrade to the equipment—as distinct from an entirely new installation—does not fit easily into the statutory language. *Compare St. Louis v. Rockwell Graphic Sys., Inc.*, 153 Ill.2d 1, 178 Ill.Dec. 761, 605 N.E.2d 555, 557 (1992) (refusing to determine as a matter of law that a newspaper printing press installed as a part of a plant expansion qualified as an "improvement to real property" under similar statute of repose). Nonetheless, as Niro notes, judicial interpretations of the phrase "improvement to real property," as used in the Massachusetts statute, have been quite broad, "giv[ing] full scope to the remedial purposes of [the statute]." *Dighton*, 506 N.E.2d at 516. *See, e.g., Snow v. Harnischfeger Corp.*, 12 F.3d 1154, 1159 (1st Cir.1993) (holding that overhead crane, even though removable, is improvement to real property); *Cournoyer v. Mass. Bay Transp. Auth.*, 744 F.2d 208, 210 (1st Cir.1984) (same for prefabricated and mass-produced steel building); *Parent v. Stone & Webster Eng'g Corp.*, 408 Mass. 108, 556 N.E.2d 1009, 1011 (1990) (same for electrical distribution panel); *Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc.*, 396 Mass. 818, 489 N.E.2d 172, 175 n. 8 (1986) (same for ship's mooring system).

■ While, as Plaintiffs argue, many of these cited improvements consisted of new construction, Massachusetts courts have also uniformly deemed upgrades to be "improvement[s] to real property." *See Conley v. Scott Products, Inc.*, 401 Mass. 645, 518 N.E.2d 849, 851 (1988) (holding that insulation in building is improvement to real property); *Salinsky v. Perma–Home Corp.*, 15 Mass.App.Ct. 193, 443 N.E.2d 1362, 1366 (1983) (same for aluminum siding). Thus, there is little question that the modification at issue here must be considered an "improvement" as contemplated by the statute. *See also Parent*, 556 N.E.2d at 1011 (applying dictionary definition of "improvement" as "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the subject property more useful or valuable as distinguished from ordinary repairs" to Mass. Gen. L. ch. 260, § 2B).[3]

### 2. When was the Improvement Opened to Use or Substantially Completed?

■ As to the second step in Niro's argument, the court does not believe that the improvement was "open[ed] ... to use" or "substantially complet[ed]" more than six years prior to June 10, 1999, the date Plaintiffs filed suit. In reaching this conclusion, the court is well aware of the usually "unforgiving nature of a statute of repose." *Nett v. Bellucci*, 269 F.3d 1, 6 (1st Cir.2001). "Unlike a statute of limitations, which bars a cause of action if not brought within a certain time period, a statute of repose prevents a cause of action from arising after a certain period. The bar of a statute of repose is absolute, whereas the bar of a statute of limitations is conditional." *James Ferrera & Sons,*

---

**3.** Evidently, to be installed, the turbofan, which weighs 25,000 pounds, was lifted into place in two pieces by a crane and mounted on a specially poured concrete foundation. Agri–Mark's plant building had to be extended to accommodate the equipment. (See Def.'s Statement of facts (included within Docket No. 66) at 7.)

*Inc. v. Samuels,* 21 Mass.App.Ct. 170, 486 N.E.2d 58, 61 (1985) (citation omitted). Still, a repose period must start at a certain point in time. Here, in light of the governing statute, the court determines that the validation of the improvement in February of 1995 is that date.

To be sure, the Massachusetts statute is not a paragon of clarity when it comes to determining when the six year period commences, particularly as applied to the type of improvement at issue here. For example, the statute contemplates two potential commencement dates—(1) "the opening of the improvement to use" or (2) "substantial completion of the improvement and the taking of possession for occupancy by the owner"—even thought the "opening" of the improvement would logically appear to follow its "substantial completion." Moreover, the "occupancy" referred to in the statute appears to contemplate the construction of a structure which may be "occupied" or for which a "certificate of occupancy" may be issued. Nonetheless, as explained, the statute has been interpreted to include certain "improvements" which obviously cannot be "occupied."

As an initial matter, the court has determined that the "improvement" in the case at bar was not "substantial[ly] complet[ed]," as provided in clause (2) of the statute, until the capacity level provided by contract was achieved. Although Agri–Mark may have taken "possession" of the improvement in December of 1992, clause (2) requires both "possession" and "substantial completion." In the court's opinion, the improvement was not "substantial[ly] complet[ed]" until it was validated in February of 1995. Niro appears not to quibble with this conclusion.

Niro argues, however, that the "opening of the improvement to use," as provided in clause (1) of the statute, occurred in December of 1992 when the installation was first tested. As explained by the Massachusetts Appeals Court, "the question whether an improvement has been substantially completed is immaterial to the determination of the date on which the statute of repose begins to run if the improvement has already been opened to use." *Coca–Cola Bottling Co. v. Weston & Sampson Eng'rs, Inc.,* 45 Mass.App.Ct. 120, 695 N.E.2d 688, 692 (1998).

In the court's opinion, clause (1) of the statute, as applied here, ultimately runs into the same problem as clause (2). The installation at issue, unlike many of the improvements in cases proffered by Niro, can only be deemed an "improvement" if it can be "used" for the upgraded service for which it was specifically designed. The upgrade, however, concededly failed in its purpose when first installed; it merely provided the same production capacity as the existing equipment. Thus, the mere fact that the equipment was turned on in December of 1992 is, in the end, immaterial. After all, Plaintiff had no choice but to use the equipment in order to stay in business. Simply put, there was no "improvement" which could be "use[d]" in the sense meant by the statute.

To conclude otherwise would unduly thwart the intent of the statute. As applied here, the statute could not have been intended to insulate Niro from exposure to claims related to an improvement when that improvement had not been completed, let alone substantially completed, or placed into actual use until years later. *Cf. Stone & Webster Eng'g Corp. v. Duquesne Light Co.,* 79 F.Supp.2d 1, 7 (D.Mass.2000) (noting that Pennsylvania statute of repose runs from the date of completion of the project); *Monson v. Paramount Homes, Inc.,* 133 N.C.App. 235, 515 S.E.2d 445, 450 (1999) (holding that logical interpretation of North Carolina statute of repose classifies date of substantial completion as date

on which improvement contract completed); *American Products Co. v. Reynolds & Stone, Rogers–O'Brien Constr. Co.,* 1998 WL 821540, at \*5 (Tex.App. Nov. 30, 1998) (determining that substantial completion in Texas statute of repose occurred when construction contract was substantially completed).

The Massachusetts Appeals Court's decision in *Coca–Cola,* although bearing some similarity to the case at bar, does not convince the court otherwise. The court in *Coca–Cola,* noted that the measuring date for statute of repose purposes was May 16, 1984, the date the improvement, a wastewater treatment facility, began operating, notwithstanding the fact that the operation of the entire plant was not up to the contractual agreement or regulatory standards at the time. *Id.,* 695 N.E.2d at 692. There, however, the facility stood alone, unlike the partial improvement to an existing plant at issue here. Moreover, the plaintiff in *Coca–Cola* conceded that its facility was open to use on May 16, 1984. *Id.* at 690. Here, in contrast, Plaintiffs never accepted the upgrade nor did they ever concede that it was in "use," as contemplated by the statute, in December of 1992. Moreover, unlike the defendant in *Coca–Cola,* Niro's continuing work on the project through the validation procedure in February of 1995 was not performed to remedy unsatisfactory conditions after the modified system was originally tested, but, rather, was required as part of Niro's contractual performance so that the expanded system, i.e., the "improvement," could, indeed, be opened to use.

At bottom, Niro has not sustained its summary judgment burden of demonstrating that either clause in the Massachusetts statute of repose bars Plaintiffs' lawsuit. Thus, the court turns to Niro's second argument.

## B. CONTRACTUAL DAMAGES

Niro also argues in its first motion that Plaintiffs' claims fail because the parties' contract, via a general terms and conditions clause, expressly excludes all the damages Plaintiffs seek. Specifically, Niro asserts that Paragraph 10 of its proposal of June 15, 1992—which they claim was accepted by Agri–Mark on October 6, 1992—includes a provision which states, in pertinent part, that "IN NO EVENT SHALL [NIRO], ITS SUBCONTRACTORS OR SUPPLIERS BE LIABLE IN CONTRACT OR IN TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER." Accordingly, Niro argues, Plaintiffs' recovery must be limited to non-consequential damages, i.e., the contract price for the purchased equipment. Plaintiffs, however, do not limit their claims for damages in that way. Rather, Niro asserts, Plaintiffs seek only consequential damages—lost profits and business interruption damages (totaling $1,125, 000) as well as property damage to the MVR and its components (totaling $293,000)—damages which are barred by the contact.

Plaintiffs mount a three-part attack. First, they contend that Niro, in violation of Fed.R.Civ.P. 8(c), failed to assert a consequential damages limitation as an affirmative defense and thereby waived the defense. Second, and more substantively, Plaintiffs assert that it is for the jury to decide, upon review of all the evidence, whether and under what terms a written contract even existed between Agri–Mark and Niro. Third, Plaintiffs argue that the contractual exclusion of consequential damages, if applicable, should be deemed

unconscionable and, therefore, unenforceable.

### 1. *Rule 8(c)*

The court will not apply Rule 8(c) in the manner suggested by Plaintiffs as neither the rule nor relevant case law supports their contention that Niro waived its consequential damages defense. Rule 8(c) requires a party, in order to avoid waiver, to specifically plead in its answer certain defenses as well as "any other matter constituting an avoidance or affirmative defense." Fed.R.Civ.P. 8(c). The purpose of the rule is to give the opposing party notice of the defense and an opportunity to develop evidence and offer counter arguments. *See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, (1st Cir. 1994);—*FDIC v. Ramirez–Rivera*, 869 F.2d 624, 626 (1st Cir.1989). To be sure, affirmative defenses not plead in accordance with Rule 8(c) may be waived. *Knapp Shoes, Inc.*, 15 F.3d at 1226. However, the First Circuit has indicated, without deciding, that noncompliance with the rule might well be excused where a plaintiff receives notice of an affirmative defense by means other than pleadings and is not prejudiced by the defense's omission from the answer. *See id.*

■ Here, it is undisputed that Niro did not raise the contractual limitation in either its answer to the original complaint or its answer to the amended complaint, or even when it sought and was granted leave to amend its second answer to plead other affirmative defenses and counterclaims based on the same contractual terms. Nonetheless, the court believes that the strictures of Rule 8(c)—assuming it applies to the contractual defense now raised by Niro—should be relaxed in this instance. In making this determination, the court has examined "the totality of the circumstances" and has made "a practical, com-monsense assessment about whether Rule 8(c)'s core purpose—to act as a safeguard against surprise and unfair prejudice—has been vindicated." *Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 593 (1st Cir.1995), *reversed on other grounds sub nom. Carpenters Local Union No. 26 v. U.S. Fidelity & Guar. Co.*, 215 F.3d 136 (1st Cir. 2000).

For one thing, no prejudice has resulted from its absence in the pleadings and fairness dictates that waiver ought not be imposed. *See Conjugal P'ship v. Conjugal P'ship*, 22 F.3d 391, 401 (1st Cir.1994) (where plaintiff understood that subject of defense would be an issue, it was not prejudiced by technical violation of Rule 8(c)). Unlike the cases upon which Plaintiffs rely, the contractual issue has been raised well before trial. *Compare, e.g., Knapp*, 15 F.3d at 1226–27. Also, the clause, if not its applicability, has been well known to Plaintiffs at least since the first deposition undertaken by the parties. Finally, as Plaintiffs themselves assert, the very existence of a contract is at issue and, as will be described, ought to be submitted to a jury.

### 2. *Jury Issue*

■ In Massachusetts, ordinarily the question of whether a contract has been made is one of fact and if the evidence does not consist only of writings or is uncontradicted, the question is for the jury. *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 724 N.E.2d 699, 703 (2000) (citations omitted). *See also David J. Tierney, Jr., Inc. v. T. Wellington Carpets, Inc.*, 8 Mass.App.Ct. 237, 392 N.E.2d 1066 (1979). Here, interestingly enough, the necessity to submit the contractual question to a jury, at Plaintiffs' request, arises out of their own failure.

They have never quite identified the written contract upon which Count III of their complaint is based.[4] Indeed, at oral argument, Plaintiffs asserted that the general terms and conditions, upon which Niro relies, were *never* part of any contract. Moreover, they argue that, even if applicable, the clause would not preclude all the damages claimed.

Plaintiffs' desire to avoid the general terms and conditions is understandable, for Niro's defense has significant force. Still, given the uncertainty as to which contract, if any, existed, the court will deny Niro's motion. There are enough material facts at issue with regard to the contract that summary judgment is not appropriate. Of course, at trial it will be Plaintiffs' burden to establish the contract upon which their claim is grounded, while Niro will have the burden of proof with respect to its affirmative defense. *See Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35, 36 (1st Cir.1998).

### 3. *Unconscionability*

In light of the above, the court does not now rule whether the limiting clause, if applicable, is unconscionable, as Plaintiffs argue. While "[t]he issue of unconscionability is only a matter of law for the court, ... the test is to be made as of the time the contract was made." *Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. 929, 936 (D.Mass.1995) (citing, inter alia, *Waters v. Min Ltd.*, 412 Mass. 64, 587 N.E.2d 231, 232 n. 3 (1992)). Here, however, we do not yet know which contract, if any, was made, let alone when it was made. The question of unconscionability, therefore, is best left to be decided in the context of a trial. Even Plaintiffs argue, citing *Bell v. Streetwise Records, Ltd.*, 640 F.Supp. 575 (D.Mass.1986), that "Massachusetts courts have frequently required an evidentiary hearing to resolve issues as to whether a contractual provision is unconscionable." (Plaintiffs' Memorandum of Law (Docket No. 73) at 31.) Accordingly, Niro's first motion for summary judgment will be denied in its entirety.

---

4. Plaintiffs' statement of material facts sets forth the confusion as to which contract applies:

The version of the Proposal produced by Niro during discovery is a document dated June 15, 1992, and is not signed by Mr. Zimmer or any other representative of Niro. In May 2001, at the completion of fact discovery, Niro produced, in response to Requests for Admissions, another version of the Proposal. This document is a signed copy of the Proposal and contains handwritten notations on the final page. Finally, while preparing the response to this Motion, Agri–Mark located in its corporate files a third version of the Proposal which contains Mr. Zimmer's signature, but differs from the second Proposal produced by Niro in that it fails to contain the handwritten notations.

All three Proposals referred to and allegedly had attached General Terms and Conditions when submitted to Agri–Mark. The unsigned Proposal produced by Niro at the outset of this litigation and the signed Proposal recently supplied by Niro both contain apparently identical General Terms and Conditions. However, the General Terms and Conditions supplied to Agri–Mark and recently discovered among Agri–Mark's corporate records is dramatically and materially different than that produced by Niro. Specifically, the actual remedy provided in the General Terms and Conditions produced by Niro limited Agri–Mark's damages to the contract price paid to Niro to complete the project, while the remedy contained in the General Terms and Conditions found in Agri–Mark's corporate files limited Agri–Mark's damages to only fifty percent (50%) of that contact price. Niro further provided in both versions that its warranty obligations were limited to repair and replacement of equipment or parts determined to be defective on inspection by Niro. Agri–Mark never received the actual General Terms and Conditions which Niro alleges it sent as part and parcel of its Proposal.

(Pls.' Facts at 4–5 (citations omitted).)

## V. NIRO'S SECOND MOTION FOR SUMMARY JUDGMENT

In its second motion for summary judgment, Niro argues that Plaintiffs' liability expert, R. Dean Harris, should be excluded because he is unqualified to render an opinion as to the proper design of the evaporator modifications. Without such testimony, Niro claims, Plaintiffs would be unable to show the required causal link with respect to any of their three causes of action, all of which Niro asserts are inextricably intertwined with complex scientific principles.

In determining whether Harris should be permitted to testify, the court must apply Federal Rule of Evidence 702 as construed by the Supreme Court in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Focusing on "scientific" knowledge, *Daubert* established a two-part test, requiring the court to determine whether the proffered expert evidence is both reliable and relevant. The reliability of the evidence, in turn, involves a four-part inquiry: (1) can the theory or technique at issue be tested; (2) has the theory or technique been subject to peer review; (3) does the theory or technique have a known error rate; and (4) has the theory or technique

been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 591–95, 113 S.Ct. 2786. Whether the evidence is relevant, on the other hand, i.e., whether it "fits" the case, requires a determination as to whether the evidence will assist the jury in determining the existence of any fact of consequence. *Id.* at 591–93, 113 S.Ct. 2786. Assuming both relevance and reliability, the evidence still "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

In 1999, the Supreme Court addressed *Daubert*'s applicability to the testimony of technical and other non-scientific experts. The court concluded "that *Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho*, 526 U.S. at 141, 119 S.Ct. 1167 (quoting Fed.R.Evid. 702). The court also concluded "that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Id.* (emphasis in original). The court cautioned, however, that "as . . . stated in *Daubert*, the test of reliability is 'flexible' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 141–42, 119 S.Ct. 1167 (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). After

**46**

*Kumho*, Rule 702 was amended to its present form, quoted above.

In support of its motion, Niro quotes two exchanges from Harris' deposition in arguing that Harris does not qualify as an expert under the Rule 702–*Daubert–Kumho* paradigm. The first exchange went as follows:

Q. Going back to '76, even up to today, have you ever been involved with or been called upon to evaluate any type of the evaporator system to make assessments or recommendations to increase the capacity of that system?

A. No, sir.

Q. How would you describe your area of expertise? If I were to ask you what your area of expertise is, what is it?

A. Machinery and Equipment.

Q. Any type of machinery, any type of equipment?

A. Any type of machinery, any type of equipment.

Q. Do you consider yourself an expert in the design of dairy evaporation systems?

A. Only in the design of various subcomponents of that system. As far as designing an entire dairy system, no, sir.

Q. How about an expert in the assessment of evaporator systems with an MVR evaporator system such as was at Agri–Mark, to assess that system to increase its capacity?

A. No, sir, I would not consider myself an expert in increasing the capacity of an MVR.

Q. Not so much increase the capacity of the MVR, but increasing the capacity of the entire evaporation system?

A. No, sir. I know what principles would be involved and I could advise people as to which general direction to go, but I would not offer myself as an expert in making recommendation to in-crease the capacity of an evaporating system.

Q. So that if Agri–Mark had come to you, say, in 1992 and said, Mr. Harris, we would like you to come out to our facility. We have got this evaporator system. We want to expand the capacity from around 110,000 pounds per hour to 150,000 pounds per hour, you would not consider yourself an expert to undertake that?

A. No, sir, not by myself.

(Docket No. 70 at 12–13.) The second exchange went as follows:

Q. With respect to design issues, do you—first of all, I guess the question is, do you feel that you have the expertise to give us a recommendation as to what should have been done in 1992 by Mr. Zimmer to have either decreased the velocity or to remove the liquid? Do you feel that's within your area of expertise?

A. I believe it is in my area of expertise to state that he should have done something to reduce the velocity or to eliminate the liquid. I would not presume to tell him exactly how it should be done other than I know that mechanical demisters are a possibility and increasing the size of vapor ducts are a possibility. There may be other means.

Q. But you don't know whether or not or exactly what should have been done in this case to have alleviated the problems that you say were there—from a design standpoint?

A. There is more than one possible choice of design, so I can't dictate that one specific one should have been done. I can state that the one that was implemented in 1998 appears to have worked.

Q. But again in terms of your area of expertise, that would be beyond it to give a specific design recommendation as to what should have been done to the

system to have alleviated these concerns you have outlined?

A. Let me put it this way: If I were aware of all the situations, the carryover problems, I would be capable of telling them you either need to specify a mechanical demister or you need to open up your flow ducts. However, at that point, I would have recommended they go to someone with more expertise in MVR design to get the details on how to do that.

(*Id.* at 14.) Niro has not specifically requested a *Daubert* hearing on the matter, preferring instead to have the issue resolved in the present summary judgment context.

██ Based on the materials submitted, the court has concluded that Niro is not now entitled to exclude Harris from testifying and, therefore, is not entitled to summary judgment. Harris appears sufficiently familiar with the component parts of the system at issue and has significant experience in fields relevant to this case. As Plaintiffs point out, Harris has extensive knowledge with respect to the components and sub-systems contained in an MVR dairy evaporator. He also has done the following: analyzed, examined, evaluated and determined the cause of failure in a wide variety of machines, including several centrifugal compressors similar to the Agri–Mark system; designed and implemented modifications on several types of machines; has positively identified fatigue fracture in prior incident investigations; analyzed a failure caused by the impact of liquid carryover in an MVR evaporator; evaluated, designed and specified an appropriate method to remove liquid carryover from a vapor stream; has developed and engineered commercially available water separators; designed and fabricated impingement baffle liquid separators. In addition, Plaintiffs note that Harris holds advanced degrees in mechanical engineer-

ing and professional engineering licenses, has twenty-five years in the field of engineering design, is the Chair of the American Society of Mechanical Engineers National Paper Session on Failure Analysis and Prevention, and has published, reviewed and approved numerous articles on issues relevant to this case.

Of course, the full scope of Harris' testimony will be addressed at a later time. For example, Harris will not be allowed to testify with respect to the design of an entire dairy system. Plaintiffs concede as much. For now, however, the court will not entirely preclude him from testifying. Therefore, summary judgment in Niro's favor will be denied.

## VI. CONCLUSION

For the foregoing reasons, Niro's motions for summary judgment are DENIED.

The clerk shall schedule a telephonic case management conference so that the court may establish a trial date.

IT IS SO ORDERED.