**AGRI–MARK, INC. and The Travelers Indemnity Company, Plaintiffs**

v.

**NIRO, INC., Defendant**

**No. CIV.A.99–30120–KPN.**

United States District Court,
D. Massachusetts.

Dec. 4, 2002.

Sean P. Carter, Cozen & O'Connor, A. Richard Bailey, Martin P. Duffey, Cozen and O'Connor, Justin B. Wineburgh, Cozen and O'Connor, Elaine M. Rinaldi, Cozen and O'Connor, Philadelphia, PA, Stuart G. Blackburn, Law Office of Stuart G. Blackburn, Windsor Locks, CT, for Agri–Mark, Inc., Plaintiffs.

Michael S. Appel, Sugarman, Rogers, Barshak & Cohen, Boston, MA, for Defendant.

## *MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 99)*

NEIMAN, United States Magistrate Judge.

As explained in the court's February 1, 2002 memorandum and order, this action arises out of two failures of an industrial milk evaporator owned and operated by Agri–Mark, Inc. ("Agri–Mark"). *Agri–Mark, Inc. v. Niro, Inc.*, 214 F.Supp.2d 33, 35 (D.Mass.2002). Agri–Mark and its subrogee, The Travelers Indemnity Company, (collectively "Plaintiffs"), allege that modifications to the system made by defendant Niro, Inc. ("Niro") caused the failures. The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c).

On February 1, 2002, the court denied Niro's initial motions for summary judgment. In doing so, the court held that the Massachusetts statute of repose did not bar the action and that Plaintiffs' liability expert would not be precluded from testifying. *See id.* at 42, 47. However, the court did not resolve Niro's claim that a contractual damages limitation clause barred Plaintiffs' action "given the uncertainty as to which contract, if any, existed" between the parties. *Id.* at 44. Discovery on this issue has since been completed and the parties now appear to agree on the documents comprising at least one of the underlying contracts. As a result, Niro again moves for summary judgment on the basis of the damages limitation clause.

For the reasons stated below, the court finds that the limitations clause applies and precludes most of the damages Plaintiffs seek. Accordingly, the court will allow Niro's motion for summary judgment in large measure.

### I. SUMMARY JUDGMENT STANDARD

A court may grant summary judgment pursuant to Fed.R.Civ.P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.*, 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

### II. BACKGROUND

Many of the facts are detailed in the court's previous memorandum and order,

*see Agri–Mark, Inc.*, 214 F.Supp.2d at 35–38, and will not be repeated here. Instead, the court will focus on those facts salient to the present issue: the potential applicability of a damages limitation clause.

### A. *February Through May of 1992*

In February of 1992, Ken Walley ("Walley"), Agri–Mark's chief project engineer, contacted Artur Zimmer ("Zimmer"), Niro's president, indicating that Agri–Mark wanted to expand the capacity of the evaporator system of its West Springfield plant. On March 4, 1992, after preliminary discussions, Zimmer sent Walley a four-page letter proposing engineering services for the project.

Zimmer's March 4th letter, which he calls an "outline" for the expansion project, is titled "Evaporator Capacity Expansion—Our Project No. 92–1109." (Docket No. 102 ("Zimmer Affidavit"), Exhibit 1 at 1.) According to Zimmer, the purpose of the letter was to develop a methodology and budget for the project. (Zimmer Affidavit ¶ 8; Docket No. 99 ("Defendant's Motion"), Exhibit C ("Zimmer Deposition") at 204.) The letter proposes three phases to the project: Phase I, the installation of a "TVR Afterburner" (estimated to cost $21,000 for equipment and $4,000 for installation); Phase II, the installation of a "Turbofan MVR Booster" (estimated to cost $300,000 for equipment, including the turbofan, and $25,000 for installation and commissioning); and Phase III, "Motor Replacement on MVR Compressor" (estimated to cost $85,000 for equipment and $10,000 for installation). (Zimmer Affidavit, Exhibit 1 at 1–3.) The letter goes on to state that "it will be most expedient in terms of cost and timing to contract with us for the engineering of Phases I and II, at least." (*Id.* at 3.) It concludes by stating that "[w]e offer you this engineering service for an amount of $30,000 payable 50% with purchase order and 50% after

submittal of documentation and equipment specifications." (*Id.* at 4.)

On March 19, 1992, Walley issued Niro a $30,000 purchase order for the "preliminary engineering services." (Zimmer Affidavit, Exhibit 2.) Niro then sent Agri–Mark a $15,000 invoice, which Agri–Mark paid on April 7, 1992. On April 30, 1992, Niro sent Agri–Mark a second $15,000 invoice. Then, on May 21, 1992, Zimmer, Walley and Bo Bjarekull, Niro's engineering manager, met to discuss the project. The content of that discussion was made part of Niro's firm "proposal" dated June 15, 1992. (*Id.*, Exhibit 6.)

### B. *The June 15, 1992 Proposal and Its Damage Limitations Clause*

Niro's June 15, 1992 proposal—which, like the March 4th letter, was titled "Evaporator Capacity Expansion—Our Project No. 92–1109"—generally states that, in exchange for $430,000, Niro would provide hardware and all necessary services to expand the capacity of Agri–Mark's milk evaporator from 110,000 pounds per hour to 150,000 pounds per hour. (See *id.*) Paragraph 7(a) of the proposal quotes a price of $395,000 "[f]or the engineering and all necessary hardware as described above, as well as the engineering assistance to complete the project (project management, erection supervision, commissioning)." (*Id.* at 6.) Paragraph 7(b) quotes a price of $35,000 "[f]or [e]rection [l]abor and [t]urbofan [t]echnician." (*Id.*) Paragraph 10 makes reference to attached "General [T]erms and Conditions." (*Id.* at 7.)

The General Terms and Conditions provide, in pertinent part, as follows:

> The following terms and conditions form part of each proposal submitted by Niro ... for the sale of equipment and services to ... [Agri–Mark] and any contract made by and between the parties

includes as a part thereof these terms and conditions....

V. WARRANTY. [Niro] warrants to the Purchaser that the equipment purchased is free from defects in material and workmanship for a period of twelve (12) months from the date of delivery of the equipment ....
[Niro's] obligation under this warranty and any other warranty or guarantee ... is strictly and exclusively limited to furnishing repairs or replacements for equipment or parts determined to be defective ....

VI. DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS PROPOSAL OR ANY RESULTING CONTRACT TO THE CONTRARY, (A) [NIRO]'S AND ITS SUBCONTRACTORS' AND ITS SUBSUPPLIERS' AGGREGATE RESPONSIBILITY AND LIABILITY, WHETHER ARISING OUT OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, UNDER THIS PROPOSAL OR RESULTING CONTRACT, INCLUDING, BUT NOT LIMITED TO, ALL CLAIMS FOR BREACH OF ANY WARRANTY OR GUARANTEE, FAILURE OF PERFORMANCE OR DELAY IN PERFORMANCE BY [NIRO] OR PERFORMANCE OR NON–PERFORMANCE OF THE PURCHASED EQUIPMENT SHALL NOT EXCEED FIFTY PERCENT (50%) OF THE CONTRACT PRICE FOR THE PURCHASED EQUIPMENT, AND (B) IN NO EVENT SHALL [NIRO], ITS SUBCONTRACTORS OR SUBSUPPLIERS BE LIABLE IN CONTRACT OR IN TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER, INCLUDING, BUT NOT LIMITED TO, LOSS OF USE OF PRODUCTIVE FACILITIES OR EQUIPMENT, LOSS OF PROFITS OR PRODUCTION, LOSS OF REVENUE OR USE OF REVENUE, PLANT DOWN–TIME, PROPERTY DAMAGE, OR EXPENSES OR DAMAGES INCURRED IN RELIANCE ON [NIRO]'S OR ITS SUBCONTRACTORS' OR SUBSUPPLIERS' PERFORMANCE OR NON–PERFORMANCE HEREUNDER, WHETHER SUFFERED BY PURCHASER OR ANY THIRD PARTY, OR FOR ANY LOSS OR DAMAGE ARISING OUT OF THE SOLE OR CONTRIBUTORY NEGLIGENCE OF THE PURCHASER, ITS EMPLOYEES OR AGENTS OR ANY THIRD PARTY.

(*Id.*, Exhibit 7.) It is undisputed that the June 15th proposal, including the General Terms and Conditions, was received by Agri–Mark. It is also undisputed that on or before July 15, 1992, Walley indicated to Zimmer that Agri–Mark had accepted the proposal.

C. *July of 1992 Through 1998*

Beginning in July of 1992, Niro took certain actions with respect to the June 15th proposal, including the ordering of a $150,000 turbofan. Shortly thereafter, in September of 1992, Niro pressed Agri–Mark for the submission of a written purchase order. On October 6, 1992, Agri–Mark tendered a purchase order (dated October 2, 1992) which mirrored the language of the June 15th proposal. On November 16, 1992, Niro sent an invoice to Agri–Mark for an initial payment of $50,000 "ACCORDING TO OUR PROPOSAL 92–1109 of 6–15–92." (*Id.*, Exhibit 13.)

By December of 1992, Niro had installed nearly all of the hardware deemed necessary to achieve the contracted rate of 150,000 pounds per hour, but the system failed to reach that rate when tested during Christmas week. Over the next several years, Niro sought, and believed it remedied, the inadequacy, and a capacity evaluation in February of 1995 served as the system's final validation. Unfortunately, the system subsequently experienced two failures, the first on May 26, 1997, the second on February 18, 1998.

### D. *Agri–Mark's Claimed Damages*

There is no dispute that Plaintiffs are seeking $1,419,209.40 in damages from Niro with respect to the two failures. Plaintiffs itemize total damages as follows:

**First Failure (May 26, 1997)**

| | |
|---|---|
| Damage to Agri–Mark's Business Personal Property ("costs to replace the MVR impeller, its drive shaft, gears, bearings and all associated components, along with all of the labor, freight and overhead costs" [1]) | $ 269,564.26 |
| Extra Expenses and Unearned Business Income Losses ("approximately $785,000" for "the costs incurred as a result of Agri–Marks's requirement to continue purchasing the excess milk of its cooperative members, notwithstanding its inability to process that milk" and "approximately $110,000" to compensate for "the evaporator system being inoperable for thirty days following the loss") | + 893,309.00 |
| Total Losses From First Failure | $1,162,873.26 |
| ($1,143,465.26 of this was reimbursed by Travelers, leaving Agri–Mark with an uninsured deductible loss of $19,408.) | |

**Second Failure (February 18, 1998)**

| | |
|---|---|
| Damage to Agri–Mark's Business Personal Property ("the costs to repair the MVR impeller and its components, along with the associated costs of labor") | $ 24,002.14 |
| Extra Expenses and Business Interruption Losses ("lost sales, extra transportation costs, broker commissions and other associated expenses[,] ... lost margins and overheads") | + 232,334.00 |
| Total Losses From Second Failure | $ 256,336.14 |
| ($243,592.14 of this was reimbursed by Travelers, leaving Agri–Mark with an uninsured deductible loss of $12,744.) | |

| | |
|---|---|
| TOTAL OVERALL LOSSES (FIRST AND SECOND FAILURES) | $1,419,209.40 |

($1,162,873.26 plus $256,336.14)

(Docket No. 105 ("Plaintiffs' Brief") at 15–17.) As is evident, the claimed damages fall into two categories: (1) property damage to the MVR and its components totaling $293,566.40 ($269,564.26 from the first failure plus $24,002.14 from the second

---

**1.** The court's parenthetical descriptions of Plaintiffs' claimed damages are taken directly from Plaintiffs' memorandum of law.

failure); and (2) lost profits and expenses resulting from the interruption of Agri–Mark's business totaling $1,125,643 ($893,-309 from the first failure plus $232,334 from the second failure).

E.  *Procedural History*

Plaintiffs' complaint, as amended, consists of three counts: negligence (Count I), breach of warranty (Count II) and breach of contract (Count III). Niro's answer to the amended complaint includes a counterclaim for breach of contract. Soon after it filed the answer, Niro filed two motions for summary judgment, one of which asserted, *inter alia,* that none of Plaintiffs' alleged damages were recoverable because of a damages limitation clause alleged to be part of the parties' contract.

As described, the court denied both motions for summary judgment. In applicable part, the court stated as follows: "Plaintiffs' desire to avoid the General Terms and Conditions is understandable, for Niro's defense has significant force. Still, given the uncertainty as to which contract, if any, existed, the court will deny Niro's motion." *Agri–Mark, Inc.,* 214 F.Supp.2d at 44. The court then allowed the parties to pursue limited discovery with respect to the contract issue.

On September 3, 2002, at a hearing on Niro's motion to bifurcate the trial (which the court denied), Niro, with Plaintiffs' consent, was given the opportunity to file a new motion for summary judgment on the damages limitation issue. It is that motion which is now before the court.

## III.  *DISCUSSION*

Niro contends that "the undisputed facts demonstrate that any damages asserted by the Plaintiffs are precluded by the contract between Niro and Agri–Mark which included Niro's June 15, 1992 Proposal and the attached General Terms and Conditions." (Docket No. 100 ("Defendant's Brief") at 8.) In response, Plaintiffs assert

that "[t]he warranty and damage limitation provisions contained in the boilerplate General Terms and Conditions attached to Niro's June 15, 1992 Proposal do not apply in this case." (Plaintiffs' Brief at 18.) In the court's view, the damages limitation clause does apply and, for summary judgment purposes, bars most (but not all) of the damages Plaintiffs seek.

In reaching this conclusion, the court has determined, as a preliminary matter, that Niro's June 15th proposal, including the attached General Terms and Conditions, was accepted by Agri–Mark within one month and, therefore, constitutes a binding contract. *See Alison H. v. Byard,* 163 F.3d 2, 6 (1st Cir.1998) ("A contract is formed upon acceptance of an offer.") Plaintiffs offer no argument to the contrary.

This preliminary determination leads the court to three findings, detailed below, which, in essence, track the main contentions Plaintiffs pursue in their memorandum of law. First, the court finds that the June 15th contract constitutes an integrated agreement which governs both the rendering of Niro's engineering services and its supply of equipment. Second, the court finds that the damages limitation clause in the June 15th contract unambiguously bars most of Plaintiffs' claimed damages. Third, the court finds that the damages limitation clause is not unconscionable, Plaintiffs' arguments to the contrary.

A.  *The June 15th Contract Constitutes an Integrated Agreement Which Governs Both the Rendering of Niro's Engineering Services and its Supply of Equipment.*

Although spanning two dozen pages, Plaintiffs' primary argument boils down to an assertion that its entire case arises out of Zimmer's March 4th letter—which Plaintiffs describe as a separate, preliminary contract for "design ser-

vices"—and not out of the June 15th contract upon which Niro relies. The June 15th contract, Plaintiffs appear to maintain, was an incidental agreement for machinery, equipment and project implementation, not design. Accordingly, Plaintiffs contend, the June 15th contract should be construed as barring, at most, only "warranty" claims made with regard to the sale of such equipment and machinery.

As will be explained below, the court finds Plaintiffs' argument unconvincing for a number of reasons. In essence, the court concludes that the March 4th letter is not a separate contract for "design services," a phrase absent from the letter itself. Rather, the court finds that the June 15th contract constitutes an integrated agreement which governs both the rendering of Niro's engineering services, including what Plaintiffs now seek to describe as "design services," and its supply of equipment.

As a preliminary matter, however, the court wishes to comment on the new clothes with which Plaintiffs seek to clad their case. Not only had Plaintiffs never specifically relied on the March 4th letter in their complaint or amended complaint—indeed, as described, it appears that Plaintiffs were unclear as to what documents formed the basis of their contract claim—their present theory, while creative, contradicts representations previously made to the court. For example, Plaintiffs specifically argued in opposition to Niro's initial motions for summary judgment that the June 15th proposal was services-based, i.e., it was "for the completion of the modification and expansion project" and consisted of Niro's agreement "to modify the evaporator system for $395,000 and perform the installation for $35,000." (Docket No. 73 at 4.) Similarly, Plaintiffs' own lia-

bility expert understood the present action to stem from Niro's June 15th "modification proposal" which he attached to his report. (Docket No. 106 ("Plaintiffs' Facts"), Exhibit B at 7–8.) Thus, through three years of litigation, Plaintiffs never argued, until now, that the June 15th contract was for equipment only or that their contract claim was solely limited to "design services" rendered pursuant to the March 4th letter.

■ It is well-settled that plaintiffs are generally not permitted to raise brand new theories of their case in opposition to a motion for summary judgment, particularly where, as here, they have been given ample latitude to amend their complaint. *See, e.g., Briddle v. Scott,* 63 F.3d 364, 380 (5th Cir.1995); *Murphy v. White Hen Pantry Co.,* 691 F.2d 350, 353 (7th Cir. 1982); *Deghand v. Wal–Mart Stores, Inc.,* 926 F.Supp. 1002, 1015 (D.Kan.1996); *Mortkowitz v. Texaco, Inc.,* 842 F.Supp. 1232, 1236 (N.D.Cal.1994). *Cf. Rodriguez v. Banco Cent. Corp.,* 990 F.2d 7, 14 (1st Cir.1993) ("The further along a case is toward trial, the greater the threat of prejudice and delay when new claims are belatedly added."). Nonetheless, Plaintiffs' revised theory is not so startling as to necessitate outright rejection at this time. *Compare Bogdahn v. Hamilton Standard,* 973 F.Supp. 52, 53–54 (D.Mass.1997) (Ponsor, J.) (criticizing plaintiff's summary judgment strategy of "refram[ing] the causes of action in the hope of latching on to something that would work"). Still, for the reasons which follow, Plaintiffs' argument fails on its merits.

First, there can be no question that the June 15th contract is an integrated agreement which subsumes the March 4th letter, even if that letter is deemed a contract.[2] Contrary to Plaintiffs' contention

---

**2.** The March 4th agreement stated that it was only an "outline," that the parties would still need "to contract ... for the engineering,"

and that "firm prices for Phases I and II that will result from the engineering work will be

that Niro's engineering services were *completed* pursuant to the March 4th agreement, the first line of the June 15th contract states only that Niro had finished "the necessary *pre*-engineering." (Zimmer Affidavit, Exhibit 6 at 1 (emphasis added).) In this vein, Bjarekull wrote to Walley on September 24, 1992, that, pursuant to the June 15th contract, Niro was "preparing an invoice ... in the amount of $100,000 *to cover our initial engineering* and material commitment for this job." (*Id.*, Exhibit 11 (emphasis added).) In addition, the purchase order Walley issued on October 6, 1992, authorized payment up to $395,000 for "[e]ngineering and all necessary hardware *to complete* the expansion." (*Id.*, Exhibit 12 (emphasis added).) As Zimmer testified at his deposition, the March 4th letter was generated so that Niro could start with "initial activities" while Agri–Mark was trying to get its approval process together. (Docket No. 107 ("Defendant's Reply Brief"), Exhibit X at 208–09.) Moreover, as described, both the March 4th letter and the June 15th contract have identical subject lines and project numbers.

██ Most importantly, the June 15th contract includes an "Integration Clause" which clearly states "that the proposal, including the general terms and conditions ..., embodies the entire agreement between [Agri–Mark] and [Niro] and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof." (Zimmer Affidavit, Exhibit 7.) Such integration clauses are well recognized and enforceable in this district:

> The rule in Massachusetts is that "[w]here the writing shows on its face that it is the entire agreement of the parties and 'comprises all that is neces-

sary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction.'"

*Elias Bros. Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F.Supp. 920, 927 (D.Mass.1993) (Collings, M.J.) (quoting *Bendetson v. Coolidge*, 7 Mass.App.Ct. 798, 390 N.E.2d 1124, 1127 (1979) (in turn quoting *Glackin v. Bennett*, 226 Mass. 316, 115 N.E. 490, 491 (1917))). *Accord Bean's Glass Service, Inc. v. Speedy Auto Glass, Inc.*, 2002 WL 974675, at *6–7 (D.Mass. May 10, 2002) (Ponsor, J.). Here, too, the record demonstrates beyond doubt that the March 4th letter was subsumed into the June 15th contract through the integration clause. Thus, the March 4th letter was not a separate agreement, as Plaintiffs would have it, involving "subject matter" outside the scope of the June 15th contract.

Second, it is equally clear that, Plaintiffs' argument to the contrary, the June 15th contract governs both the supply of equipment and the rendering of all engineering services, including what Plaintiffs now describe as "design services." According to Zimmer, the June 15th contract was a firm proposal setting forth the methodology, cost and specifications for accomplishing the evaporator expansion. As described, Paragraph 7(a) of the contract quotes the price of $395,000 "[f]or the engineering and all necessary hardware as described above, as well as the engineering assistance to complete the project (project management, erection supervision, commissioning)," and paragraph 7(b) quotes a price of $35,000 "for [e]rection [l]abor and [t]urbofan [t]echnician." (Zimmer Affida-

adjusted for the cost of engineering already completed ...." (Zimmer Affidavit, Exhibit 1

at 1, 3–4.)

vit, Exhibit 6 at 6.) And, as indicated, the contract was further "memorialized" on October 6, 1992, when Walley issued the purchase order to Niro for both goods and services. (See *id.*, Exhibit 12.)

In this regard, the court notes that the damages limitation clause itself is not limited to equipment. Indeed, the preamble to the General Terms and Conditions states that it applies to the sale of both "equipment and services." (See *id.*, Exhibit 7 ("The following Terms and Conditions form part of each proposal submitted by Niro ... for the sale of equipment and services to ... [Agri–Mark] and any contract made by and between the parties includes as a part thereof these terms and conditions.").) Other clauses in the General Terms and Conditions similarly refer to both goods and services. As examples, Clause II, "Completion and Delivery," states that Niro will endeavor to timely "make delivery or complete the work," and Clause XII indicates that Niro "shall comply with all applicable laws [and] rules ... of all ... agencies having regulatory jurisdiction over the equipment or work provided by [Niro] under this proposal." (*Id.*)

To be sure, the June 15th contract, as Plaintiffs assert, calls for the purchase of equipment—principally a turbofan—and the equipment itself was subject to a warranty outlined in the General Terms and Conditions. But, there is no question that, reading the agreement as a whole, as the court must do, *see Dasey v. Anderson,* 304 F.3d 148, 158 (1st Cir.2002) (citing Massachusetts law), the June 15th contract covers both equipment *and* services. Plaintiffs' alternative interpretation, par-

ticularly their attempt to hog-tie the damages limitation clause to the equipment warranty only, stretches the contract language beyond what is reasonable.[3]

**B.** *The Damages Limitation Clause Unambiguously Bars Most of Plaintiffs' Claimed Damages.*

■ Concluding that the June 15th contract governs, the court, as the parties request, will interpret its damages limitation clause. "Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court." *Coll v. PB Diagnostic Systems, Inc.,* 50 F.3d 1115, 1122 (1st Cir.1995) (citations and internal quotation marks omitted). Should the court find the contract language unambiguous, it must interpret it according to its plain terms. *Bank v. Int'l Bus. Mach. Corp.,* 145 F.3d 420, 424 (1st Cir.1998) (citation omitted). If those plain terms unambiguously favor one side, then summary judgment is appropriate. *Id.*

The damages limitation clause has two subclauses which the court will discuss, albeit in reverse order. For the reasons which follow, the court concludes that subclause (B) bars Plaintiffs' claimed damages for lost profits and expenses (amounting to $1,125,643), but that the application of both subclauses (A) and (B) to Plaintiffs' property damages and the price of purchased equipment must await trial.

1. *Subclause (B)*

■ In essence, subclause (B) of the damages limitation clause bars consequential damages. In pertinent part, it pro-

**3.** As Niro makes clear in its reply brief, cases supporting Plaintiff's "warranty and damages" argument are inapposite to the facts at issue here. (See Defendant's Reply Brief at 8–10 (distinguishing *Omni Flying Club, Inc. v. Cessna Aircraft Co.,* 366 Mass. 154, 315 N.E.2d 885 (1974)); *Standard Register Co. v. Bolton–Emerson, Inc.,* 38 Mass.App.Ct. 545, 649 N.E.2d 791 (1995); *Keystone Aeronautics Corp. v. R.J. Enstrom Corp.,* 499 F.2d 146 (3d Cir.1974); *Roskam Baking Co. v. Lanham Mach. Co.,* 71 F.Supp.2d 736 (W.D.Mich. 1999); *Frick Forest Prods., Inc. v. Int'l Hardwoods, Inc.,* 161 Ga.App. 359, 288 S.E.2d 625 (1982); and *Appling Motors, Inc. v. Todd,* 143 Ga.App. 644, 239 S.E.2d 537 (1977).)

vides that "in no event shall [Niro] ... be liable in contract or in tort, including negligence and strict liability[,] for any special, punitive, indirect, incidental or consequential damages of any kind or character ...." It then goes on to give examples of "indirect, incidental or consequential damages," including "loss of use of productive facilities or equipment, loss of profits or production, loss of revenue or use of revenue, plant down-time, property damage, or expenses or damages incurred in reliance on [Niro]'s ... performance or non-performance." (Zimmer Affidavit, Exhibit 7.)

Subclause (B) unambiguously applies to this case. By its very terms, it governs all actions "in contract or in tort, including negligence and strict liability." Obviously, therefore, subclause (B) applies to Counts I and III, Plaintiffs' claims for negligence and breach of contract. It applies as well to Count II, Plaintiffs' "breach of warranty" cause of action. As District Judge Douglas P. Woodcock recently explained, "Massachusetts law recognizes two different breach of warranty theories—one that derives from contract law, the other from strict liability in tort." *W.R. Constr. & Consulting, Inc. v. Jeld–Wen, Inc.*, 2002 WL 31194870, at *6 (D.Mass. Sep. 20, 2002) (citing cases). Either way, Count II is governed by subclause (B).

As applied here, subclause (B) precludes recovery of the "extra expenses and unearned business income losses" of $893,309 from the first failure and of the parallel "extra expenses and business interruption losses" of $232,334 from the second failure. As Plaintiffs themselves describe, these are the very type of "indirect, incidental or consequential" damages barred by subclause (B).[4] Accordingly, the court will allow Niro's motion for summary judgment insofar as it seeks to preclude the $1,125,643 claimed damages for lost profits and expenses.

■ Niro also makes a strong argument that Plaintiffs' "personal property" losses ($269,564.26 from the first failure and $24,002.14 from the second failure) are barred as well by subclause (B) as consequential or incidental "property damage." However, for purpose of summary judgment, the court cannot say that the facts unambiguously support Niro on this point. Most problematically, neither side has defined exactly what "property" was damaged or the claimed value of that property.[5] Accordingly, the court is not prepared to apply subclause (B) to Plaintiffs' "personal property" losses as a matter of law. *See Bank*, 145 F.3d at 424 ("summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary") (citations and internal quotation marks omitted). The resolution of this particular issue must await trial.

### 2. *Subclause (A)*

■ In essence, subclause (A) of the damages limitation clause limits Plaintiffs

---

4. Plaintiffs concede in their brief that the $893,309 figure consists of "approximately $785,000" for "the costs incurred as a result of Agri–Marks's requirement to continue purchasing the excess milk of its cooperative members, notwithstanding its inability to process that milk" and "approximately $110,000" to compensate for "the evaporator system being inoperable for thirty days following the loss." (Plaintiffs' Brief at 16.) Plaintiffs also concede that the $232,334 fig-

ure consists of "lost sales, extra transportation costs, broker commissions and other associated expenses[,] ... lost margins and overheads." (*Id.* at 16–17.)

5. To the extent that the damaged "property" may be considered "purchased equipment," subclause (A) of the damages limitation clause would appear to allow Plaintiffs to recover up to fifty percent of the purchase price. *See* discussion *infra*.

to a recovery of fifty percent of the contract price for purchased equipment. In particular, subclause (A) provides that "[Niro]'s aggregate responsibility and liability, whether arising out of contract or tort, including negligence and strict liability, under this proposal or resulting contract, including, but not limited to, all claims for breach of any warranty or guarantee, ... shall not exceed fifty percent (50%) of the contract price for the purchased equipment." (Zimmer Affidavit, Exhibit 7.)

As with subclause (B), the court concludes that subclause (A) applies, in a general sense at least, because Plaintiffs seek recovery for Niro's "liability ... arising out of contract or tort, including negligence or ... for breach of warranty." The precise application of subclause (A) to the case at hand, however, is another matter.

Although Niro avers that the cost of the turbofan exceeded $150,000 (Defendant's Brief at 5) and the March 4th letter would appear to price all the proposed equipment at $406,000 ($21,000 for Phase I, plus $300,000 for Phase II, plus $85,000 for Phase III), the parties have not informed the court as to exactly how much of the total contract price of $430,000 includes "purchased equipment." The court itself will not speculate. As with the precise scope of Plaintiffs' "personal property" damage claim, this factual issue will need to be resolved at trial.

C. *The Damages Limitation Clause is not Unconscionable.*

██ Finally, since the court believes that the damages limitation clause unambiguously bars most, albeit not all, of Plaintiffs' claimed damages, the court must consider Plaintiffs' revived argument that the clause should be deemed void as "unconscionable." The court did not reach this question in its previous memorandum

and order. *See Agri–Mark, Inc.,* 214 F.Supp.2d at 44 (deferring unconscionability issue because "we do not yet know which contract, if any, was made, let alone when it was made"). Now, however, knowing the contract at issue, the court is prepared to conclude that the damages limitation clause is not unconscionable.

██ It is well-established that the issue of unconscionability is one of law for the court and must be measured as of the time the contract was entered. *See Piantes v. Pepperidge Farm, Inc.,* 875 F.Supp. 929, 936 (D.Mass.1995) (Gertner, J.) (citing, *inter alia, Waters v. Min Ltd.,* 412 Mass. 64, 587 N.E.2d 231, 232 n. 3 (1992)). As the Massachusetts Supreme Judicial Court explains, a court may consider the following factors when determining whether a clause excluding consequential damages is unconscionable: (1) the sophistication of the parties; (2) the plaintiff's clear intent to accept the risk of consequential damages; and (3) the existence of a minimally adequate remedy such as a refund of the contract price. *See Canal Elec. Co. v. Westinghouse Elec. Corp.,* 406 Mass. 369, 548 N.E.2d 182, 185 (1990) (answering certified question) (citations omitted).

There is no question that Agri–Mark, like Niro, is a sophisticated business entity. Agri–Mark is a cooperative of 1,400 dairy farmers located throughout seven northeastern states and it operates four dairy plants. In addition to the West Springfield plant, Agri–Mark operates a facility in Middlebury, Vermont and two other plants in Cabot, Vermont. Cabot Creamery Corporation is a wholly-owned subsidiary of Agri–Mark.

It is also clear that Agri–Mark assented to the damages limitation clause when it accepted the June 15th contract. *See Canal Elec.,* 548 N.E.2d at 185 ("[Plaintiff]'s assent to the ... policies demonstrates a clear intent to accept the risk of conse-

quential damages. "). In fact, as Niro observes, such limitation of damages provisions were common parts of the parties' prior agreements. Not only did Niro's invoices for the pre-engineering analysis contain a limitation on consequential damages, a previous contract between Agri–Mark and Niro's predecessor contained a damages limitation clause very similar to the one presently at issue.

Finally, the instant damages limitation clause provides for a remedy, i.e., a refund of up to one-half of the contract price for purchased equipment. Granted, the exact contract price of such equipment is unknown at this time, although it appears from the March 4th letter to be as much as $406,000. As Niro points out, however, a remedy for commercial entities may be deemed adequate as long as it is agreed upon and not *de minimis*.[6] Such is the case here. Agri–Mark and Niro contracted for a specific allocation of risk and the court is not prepared at this time to upset that agreed-upon balance. *See Canal Elec.*, 548 N.E.2d at 185 (reiterating observation "that the consensual allocation of risk is not contrary to public policy"); *Deerskin Trading Post, Inc. v. Spencer Press, Inc.*, 398 Mass. 118, 495 N.E.2d 303, 308 (1986) ("Limiting damages to a refund of the purchase price ... where the two parties are sophisticated business entities, and where consequential damages in the event of a problem could be extensive, is a reasonable business practice."); *American*

*Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 458 (S.D.N.Y.1976) (normally, "the agreed-upon allocation of commercial risk should not be disturbed") (quoted in *Canal Elec.*, 548 N.E.2d at 186). In sum, given the present facts, the court believes that the damages limitation clause is not unconscionable.

### IV. CONCLUSION

For the foregoing reasons, Niro's motion for summary judgment is ALLOWED insofar as the damages limitations clause included within the June 15th contract precludes recovery of the "extra expenses and unearned business income losses" of $893,309 from the first failure and of the "extra expenses and business interruption losses" of $232,334 from the second failure. In all other respects, Niro's motion for summary judgment is DENIED.

The clerk shall schedule a final pretrial conference and trial.

IT IS SO ORDERED.

---

**6.** For example, in *V–M Corp. v. Bernard Distrib. Co.*, 447 F.2d 864 (7th Cir.1971), a case relied upon by the SJC in *Canal Electric*, the Seventh Circuit applied the Uniform Commercial Code ("UCC")'s principle that, in limiting damages, the parties may agree to "provide for remedies in addition to or in substitution for those provided in this Article." *See id.* at 868–69 n. 5 (quoting UCC § 2–719(1)). *See also* Mass. Gen. L. ch. 106, § 2–719(1). As the court observed, the UCC "was intended to encourage and facilitate consensual allocations of risks," particularly in commercial transactions. *Id.* at 869. *See also Canal Elec.*, 548 N.E.2d at 185 (" § 2–719 was 'intended to encourage and facilitate consensual allocations of risks associated with the sale of goods,' as long as minimum adequate remedies are available to a party injured by a breach"); *Board of Directors of Harriman Sch. Dist. v. Southwestern Petrol. Corp.*, 757 S.W.2d 669 (Tenn.Ct.App.1988) (consequential damages disclaimer unenforceable when no minimum adequate remedy available).