**UNITED STATES of America,
Plaintiff,**

v.

**Louis W. MOUNTZOURES, Defendant.**

**Westport Insurance Corporation,
Intervening Plaintiff,**

v.

**Louis W. Mountzoures and United States of America, Intervention Defendants.**

No. CIV.A.03–12188–JLT.

United States District Court,
D. Massachusetts.

June 15, 2005.

Shawn P. Bailey, United States Department of Justice, Trial Attorney, Commercial Litigation Branch, Washington, DC, Jeannine R Lesperance, J. Christopher Kohn, John W. Showalter, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, Gina Y. Walcott–Torres, United States Attorney's Office, John Joseph Moakley Federal Courthouse, Boston, MA, Frances M. McLaughlin, Washington, DC, for United States of America, Plaintiff.

George A. Berman, Timothy O. Egan, Peabody & Arnold LLP, Boston, MA, Jon C. Cowen, Posternak, Blankstein & Lund Prudential Tower, Boston, MA, Brian M. Hurley, Mary E. Windham, Rackemann, Sawyer & Brewster, Boston, Harvey Weiner, Peabody & Arnold LLP, Boston, MA, for Louis Mountzoures, Defendant.

Lynne McNeill, Morrison Mahoney LLP, Boston, MA, for Westport Insurance Corporation, Intervenor Plaintiff.

*MEMORANDUM*

TAURO, District Judge.

Opus Telecom, LLC provided collect calling telephone services to prison inmates under contracts with the Federal Bureau of Prisons. After Opus Telecom, LLC encountered serious financial difficulties, the Defendant Louis Mountzoures dissolved the company and its subcontractor, Opus Correctional, LLC. The United States alleges that Mountzoures violated the federal priority statute when he disbursed the combined assets of these companies to creditors.[1] Mountzoures has moved for partial summary judgment, arguing that the federal priority statute does not apply to the distribution of Opus Correctional's assets.

### Background

Opus Telecom, LLC (hereinafter "Telecom") specialized in developing hardware and software to track telephone usage patterns for businesses and law firms.[2] Between 1996 and 1998, Telecom entered into two contracts with the Federal Bureau of Prisons ("BOP") for the provision of collect calling services for prison inmates.[3] Under both contracts, Telecom was the prime contractor and Opus Correctional, LLC (hereinafter "Correctional") was a subcontractor.[4]

The two BOP–Telecom contracts, or revenue-sharing agreements, were performed as follows: Telecom monitored collect calls made by inmates and created lists of amounts owed by persons charged with these calls.[5] Telecom sent these lists to a

---

1. 31 U.S.C. § 3713.

2. Def.'s Statement of Undisputed Facts [# 46] (hereinafter "Def.'s Facts") ¶ 2; United States' Resp. to Def.'s Statement of Undisputed Facts [# 48] (hereinafter "US Facts") ¶ 99.

3. Def.'s Facts ¶¶ 9, 10; US Facts ¶¶ 5, 6.

4. US Facts ¶¶ 5, 6.

5. Mem. of Law in Supp. of Def.'s Mot. for Partial Summ. J. at 5.

billing provider called ZPDI. ZPDI collected the charges and sent the revenue to Correctional. Correctional disbursed the proceeds to Telecom and the BOP according to their respective contractual shares of the revenue under the BOP–Telecom contracts.[6] Although Correctional sent a portion of the collect call revenue directly to the BOP, only Telecom had entered into written contracts with the BOP.[7]

Telecom and Correctional began to experience serious financial difficulties [8] and, in May of 1999, Correctional stopped sending the BOP its share of the collect call revenue. Eventually, Correctional failed to remit a total of $2,734,390.57 to the BOP. There is no dispute that this sum was due under the BOP–Telecom contracts.[9]

On December 16, 1999, Barry Kostin, the Chief Financial Officer of Telecom, and Jay Gainsboro, the President and Founder of both companies, made a presentation to the BOP in Washington, DC regarding the financial difficulties of the two companies.[10] Kostin and Gainsboro incorrectly assumed that the BOP had entered into contracts with Correctional, not Telecom.[11] At the meeting, BOP employees corrected their mistake and informed them that the BOP had contracts only with Telecom, not Cor-

rectional.[12] After the meeting, Kostin inspected the records and wrote a letter to the BOP acknowledging his earlier mistake.[13]

In February of 2000, Telecom and Correctional hired the Defendant Louis Mountzoures, an attorney who specialized in representing debtors in bankruptcy proceedings.[14] Mountzoures had no prior involvement with either company.[15] Instead of putting the companies through bankruptcy, Mountzoures decided to liquidate the assets of the two companies and make assignments for the benefit of creditors. Mountzoures believed that avoiding bankruptcy would maximize recovery for all creditors and would permit telephone services to continue uninterrupted for the BOP.[16] The companies' creditors were notified of this decision.[17] None of the creditors, including the BOP, objected to the proposal.[18] The BOP, however, would need authorization from the Department of Justice ("DOJ") before it could formally accept any distributions.[19]

On April 7, 2000, Telecom and Correctional filed separate assignments for the benefit of creditors.[20] Mountzoures was appointed assignee to liquidate the assets of the companies.[21] As planned, Mountzoures consolidated the assets of the two

6. US Facts ¶¶ 12, 13, 17, 18.

7. Def.'s Facts ¶ 13; US Facts ¶ 102.

8. Def.'s Facts ¶ 17; US Facts ¶ 106.

9. Def. Mountzoures's Answer to Compl. ¶ 20; US Facts ¶ 22.

10. BOP Aff. of Barry Kostin ("Kostin Aff.") ¶ 18.

11. *Id.* ¶ 17.

12. *Id.* ¶ 20.

13. *Id.* ¶ 22.

14. Def.'s Facts ¶¶ 22, 23; US Facts ¶ 111.

15. Def.'s Facts ¶ 23; US Facts ¶ 111.

16. Def.'s Facts ¶ 24; US Facts ¶ 111.

17. Def.'s Facts ¶ 26. The United States does not dispute this fact, at least with respect to the BOP. *See* U.S. Facts ¶ 113.

18. Def.'s Facts ¶¶ 26, 27. The BOP's objection came much later. *See* U.S. Facts ¶ 113.

19. US Facts ¶ 51.

20. Def.'s Facts. ¶ 31; US Facts ¶ 118. *See* Mass. Gen. Laws ch. 203, § 40, *et seq.*

21. Def.'s Facts ¶ 32; US Facts ¶ 118.

companies, liquidated the hard assets, and deposited all funds into a single account.[22]

On November 20, 2000, Mountzoures sent a letter to each creditor, including the BOP, informing them of the status of the dissolutions and outlining his plan to provide each creditor with a proportionately equal share of the combined assets of the companies.[23] At this time, the BOP did not object to the plan or assert any federal right to priority.[24] But, the DOJ had not yet approved the BOP's acceptance.[25]

On December 7, 2000, Mountzoures distributed an initial payment constituting 10% of each creditor's claim against the two companies.[26] Prior to the distribution, Mountzoures notified the creditors, including the BOP, in writing, of the identity of each creditor and the amount each would receive.[27] Again, the BOP did not object or assert any federal right to priority.[28]

Eleven months later, on October 26, 2001, Mountzoures informed the BOP of his intention to distribute the remaining assets equally among the creditors.[29] The BOP still did not object, though the distribution was placed in escrow as the DOJ had still not authorized the BOP's acceptance.[30]

On November 19, 2001, after the final distributions were made, the BOP asserted, for the first time, its right to priority pursuant to 31 U.S.C. § 3713.[31] The Government concedes that neither Mountzoures nor the BOP was aware of the existence of the federal priority statute until the DOJ informed them in November of 2001.[32] When informed of the statute, the BOP asserted priority to the entire combined assets of *both* Telecom and Correctional.[33] At the BOP's request, Mountzoures attempted to recapture the assets by sending demand letters to the creditors of the companies.[34] Some creditors returned their dividends.[35]

Mountzoures contends that the liquidated assets of Telecom yielded $461,860.16, while Correctional's assets generated $877,911.83.[36] The Government disputes these numbers. It is undisputed, however, that the BOP has received $355,470.77, which represents approximately 13% of the total amount owed to the BOP under the BOP–Telecom contracts.[37] Mountzoures has moved for partial summary judgment, arguing that the BOP did not have a valid claim to the liquidated assets of Correctional. The Government argues that it had valid claims, and therefore priority, to the entire combined assets of both companies. For purposes of the instant motion, the only question before this court is whether the federal priority statute governs the distribution of Correctional's assets.

22. Def.'s Facts ¶ 33; US Facts ¶ 118.

23. Def.'s Facts ¶¶ 33, 35; US Facts ¶¶ 118, 120.

24. Def.'s Facts ¶¶ 34, 37; US Facts ¶¶ 119, 121.

25. US Facts ¶ 51.

26. Def.'s Facts ¶ 36; US Facts ¶ 120.

27. Def.'s Facts ¶ 36; US Facts ¶ 120.

28. Def.'s Facts ¶ 37; US Facts ¶ 121.

29. Def.'s Facts ¶ 38; US Facts ¶ 122.

30. Mem. of Law in Supp. Def.'s Mot. for Partial Summ. J. at 8; US Facts ¶ 74.

31. Def.'s Facts ¶ 42; US Facts ¶ 126.

32. US Facts ¶ 81.

33. Def.'s Facts ¶ 43; US Facts ¶ 127.

34. US Facts ¶¶ 82, 83.

35. *Id.* ¶ 85.

36. Def.'s Facts ¶ 41.

37. *Id.* ¶ 44; US Facts ¶ 94; Compl. ¶ 27, 28, 29.

## Discussion

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only if the record reveals that there is "no genuine issue as to any material fact and ... the moving party [has demonstrated an] entitle[ment] to a judgment as a matter of law."[38] Under this standard, the "party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue."[39] In deciding whether to allow a motion for summary judgment, a court "'must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'"[40]

The federal priority statute, in relevant part, provides, "A claim of the United States Government shall be paid first when a person indebted to the Government is insolvent and the debtor without enough property to pay all debts makes a voluntary assignment of property."[41] A person representing the debtor is personally liable to the United States to the extent that he pays another debt before paying the Government.[42] The statute does not apply to bankruptcy proceedings under Title 11.[43]

It is undisputed that Correctional was insolvent and lacked sufficient property to pay all debts. It is also undisputed that Mountzoures represented Correctional and made voluntary assignments of property without first paying an alleged claim of the Government. The only disputed issue, therefore, is whether Correctional was, in fact, indebted to the BOP. On this issue, the Supreme Court has placed the burden of proof on the Defendant.[44]

### A. Piercing the Corporate Veil

■ The BOP did not have an express contract with Correctional. The Government argues, however, that a reasonable trier of fact could disregard the separate legal identities of Telecom and Correctional by piercing the corporate veil, thereby holding Correctional liable for Telecom's debts. The Parties agree that federal common law governs this inquiry because "the federal statute in question demands national uniformity."[45] The federal veil piercing standard, however, "is notably imprecise and fact-intensive."[46] There is no

---

**38.** Fed.R.Civ.P. 56(c). "In the lexicon of Rule 56, 'genuine' connotes that the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party, and 'material' connotes that a contested fact has the potential to alter the outcome of the suit under the governing law if the controversy over it is resolved satisfactorily to the nonmovant." *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

**39.** *Blackie*, 75 F.3d at 721 (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995)).

**40.** *Mullin v. Raytheon Co.*, 164 F.3d 696, 698 (1st Cir.1999) (quoting *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990)).

**41.** 31 U.S.C. § 3713(a)(1)(A)(i).

**42.** 31 U.S.C. § 3713(b).

**43.** 31 U.S.C. § 3713(a)(2).

**44.** *Beaston v. Farmers' Bank of Del.*, 37 U.S. 102, 134, 12 Pet. 102, 9 L.Ed. 1017 (1838); *United States v. Bridle Path Enters., Inc.*, No. Civ.A. 99–11051–GAO, 2001 WL 1688911, at *4 (D.Mass. Dec.4, 2001) (citing *Bramwell v. U.S. Fid. & Guar. Co.*, 269 U.S. 483, 487, 46 S.Ct. 176, 70 L.Ed. 368 (1926)).

**45.** *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26 (1st Cir. 2000) (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)).

**46.** *Id.* (quoting *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 21 (1st Cir.1998)).

"litmus test" determining when federal courts should disregard corporate form.[47] "Instead, the rule in federal cases is founded only on the broad principle that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity.'"[48]

Open-ended as the inquiry may be, this court finds guidance under the First Circuit's ERISA jurisprudence. In ERISA cases, a federal court applying the federal veil piercing standard should consider (1) whether the entities in question ignored the independence of their separate operations, (2) whether some fraudulent intent existed, and (3) whether a substantial injustice would be done by validating the corporate shield.[49] While none of these factors are determinative, "a finding of some fraudulent intent is a sine qua non to the remedy's availability."[50]

There are two distinct time periods to consider—the pre-assignment operation of the companies and the post-assignment operation of the companies.[51] During the pre-assignment operation of the two companies, the Government points to some evidence that the companies ignored the independence of their separate operations. The companies shared upper management, a common single majority investor, office space, and equipment.[52] For some time, upper management mistakenly believed that Correctional had contracts with the BOP.[53] The Government does not show, however, that management failed to observe separate corporate formalities or failed to maintain separate corporate records. The Government's own evidence shows that the BOP was not confused as to which company was bound by the BOP–Telecom contracts.[54] Importantly, the Government does not suggest that the two companies were formed for illegitimate purposes or were operated in a fraudulent manner.

With respect to the post-assignment operation of the companies, Mountzoures concedes that he largely ignored the independence of Telecom and Correctional.[55] It is undisputed that Mountzoures liquidated the assets of the two companies and combined them into a single account. But it is also undisputed that Mountzoures did so only after notifying the companies' creditors. Mountzoures received no objections from any of the creditors, including the BOP. Mountzoures combined the companies' assets methodically, in the light of day, and for the benefit of creditors.

The Government admits that neither Mountzoures nor the BOP was aware of the existence of the federal priority statute until after Mountzoures made the final distributions.[56] The Government does not suggest any fraudulent intent or that Mountzoures had anything to gain personally by combining the assets for distribution. Mountzoures had no connection with the companies prior to his representation

---

47. *Id.* (quoting *Alman v. Danin*, 801 F.2d 1, 3 (1st Cir.1986)).

48. *Id.* (quoting *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981)).

49. *United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1093 (1st Cir.1992).

50. *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 22 (1st Cir.1998) (quoting *United Elec.*, 960 F.2d at 1093) (quotations omitted).

51. United States' Opp'n to Def's Mot. for Partial Summ. J. at 12.

52. *See* United States' Opp'n to Def's Mot. for Partial Summ. J. at 15.

53. *Id.*

54. *See* Kostin Aff. ¶ 20.

55. Reply Br. in Supp. of Def.'s Mot. for Partial Summ. J. at 11.

56. US Facts ¶ 81.

of the entities, and there is no evidence to suggest that his error was anything other than an honest oversight. Moreover, the BOP had ample opportunity to object to Mountzoures's distribution plan. Instead, the Government sat on its hands for over nineteen months.

Under the totality of circumstances, fairness and equity counsel decidedly against piercing the corporate veil. Because there is no evidence of fraudulent intent, and because substantial injustice would be done by disregarding corporate form, there is no legally sufficient basis for a fact-finder to pierce the corporate veil to hold Mountzoures personally liable for the distribution of Correctional's assets.

### B. *The Government's New Theories*

■ In opposing the instant motion for partial summary judgment, the Government has asserted, for the first time, that the BOP was an intended third-party beneficiary of a subcontract between Telecom and Correctional. Mountzoures had no notice of this claim before making the distributions, and the Government did not allege this theory of liability in the complaint. "It is well-settled that plaintiffs are generally not permitted to raise brand new theories of their case in opposition to a motion for summary judgment." [57]

The BOP never informed Correctional or Mountzoures of its claim against Correctional as a third-party beneficiary. In an affidavit submitted by the Government, Correctional's CFO, Barry Kostin, explains that BOP employees corrected his mistake when he indicated that the BOP had contracts with Correctional.[58] In identifying the BOP as a creditor of Telecom and not Correctional, no one asserted that the BOP was also a third-party beneficiary of Correctional's subcontract. Nor did the Government inform Mountzoures, before he made the distributions, of the BOP's third-party beneficiary claim. Without notice of the BOP's claim, Mountzoures cannot be held liable under the federal priority statute.[59]

Furthermore, in the complaint, the Government did not allege that the BOP was a third-party beneficiary of a Telecom–Correctional contract. The complaint merely alleges that "Mountzoures treated the Opus Companies as a single entity." [60] This veil piercing argument is the only theory of Correctional's liability to the BOP that can be inferred from the complaint. The terms of Correctional's contract with Telecom have never been at issue in this case, and neither party has made the language of the relevant contract available to this court. Discovery is now closed. As a result, the Government may not rely on this newly minted, third-party beneficiary claim to survive summary judgment. This court acts "well within its discretion in refusing to allow tardy reliance upon such a postulate." [61]

■ Even if this court were to entertain the merits of the Government's third-party

**57.** *Agri–Mark, Inc. v. Niro, Inc.,* 233 F.Supp.2d 200, 207 (D.Mass.2002).

**58.** Kostin Aff. ¶ 20.

**59.** *Want v. C.I.R.,* 280 F.2d 777, 783 (2nd Cir.1960) ("[I]t has long been held that a fiduciary is liable only if it had notice of the claim of the United States before making the distribution."); *see also United States v. Vibradamp Corp.,* 257 F.Supp. 931, 936 (S.D.Cal. 1966).

**60.** Compl. ¶ 32.

**61.** *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 995 (1st Cir. 1988); *see also Rodriguez v. Banco Cent. Corp.,* 990 F.2d 7, 14 (1st Cir.1993) ("The further along a case is toward trial, the greater the threat of prejudice and delay when new claims are belatedly added.").

**20**

beneficiary claim, Mountzoures would still be entitled to summary judgment.[62] In order for a third party to enforce a contract under Massachusetts law, "[i]t must appear from the language and circumstances of the contract that the parties to the contract clearly and definitely intended the beneficiaries to benefit from the promised performance."[63]

In *Choate, Hall & Stewart v. SCA Services, Inc.*, the Massachusetts Supreme Judicial Court held that a law firm could sue as a third-party beneficiary to enforce a contract in which the defendant corporation promised to pay its directors' legal fees.[64] The law firm represented members of the board of directors and sought compensation from the defendant corporation. Because the defendant explicitly promised to make payments for legal services "directly" to counsel, the SJC found that the law firm had standing to sue as a third-party beneficiary of the directors' indemnification agreement.[65]

*Choate, Hall & Stewart* is distinguishable. Here, the Government has not pointed to any specific language in the Telecom–Correctional agreement. Instead, the Government asks this court to infer a clear and definite intent to benefit the BOP from the fact that Correctional forwarded collect call revenue directly to the BOP. But Correctional also sent revenue to Telecom. At best, the circumstances indicate Correctional's intent to distribute revenue according to the BOP–Telecom revenue-sharing agreements. Unlike the situation in *Choate, Hall & Stewart*, Correctional was not compensating the BOP for services rendered. Rather, Correctional performed the ministerial function of cutting and mailing checks to both Telecom and the BOP according to their revenue-sharing agreements. If the Government's third-party beneficiary claim were timely, the nature of Correctional's performance alone would not raise a trial-worthy issue regarding Correctional's clear and definite intent to benefit the BOP.

■ The Government also argues, for the first time, that Correctional was directly indebted to the BOP under an implied-in-fact contract. Like the third-party beneficiary claim, Mountzoures had no notice of this claim before making the distributions, and the Government did not allege this theory of liability in the complaint. The Government may not rely on this newly discovered implied-in-fact contract. In addition to being tardy, however, this claim lacks merit. The Government's undisputed evidence reveals that BOP employees expressly repudiated any contractual relationship between the BOP and Correctional.[66] Even if Mountzoures had notice of this claim, and even if the Government had alleged an implied-in-fact contract in the complaint, there would be no trialworthy issue.[67]

62. Although neither party has specifically addressed the choice of law issue, the substantive laws of Massachusetts would most likely apply.

63. *Miller v. Mooney*, 431 Mass. 57, 725 N.E.2d 545, 550 (2000) (quoting *Anderson v. Fox Hill Vill. Homeowners Corp.*, 424 Mass. 365, 676 N.E.2d 821, 822 (1997)) (internal quotations and alterations omitted).

64. 378 Mass. 535, 392 N.E.2d 1045, 1053 (1979).

65. *Id.* at 1052.

66. Kostin Aff. ¶ 20. After the BOP denied having contracts with Correctional, Correctional's CFO confirmed, in writing, the nonexistence of a contractual obligation between the BOP and Correctional. *Id.* ¶ 22.

67. *See O'Kelly v. BASF Magnetics Corp.*, No. CA002527, 2001 WL 716905, at *2 (Mass.Super. April 13, 2001) (dismissing a claim for breach of employment contract "implied in fact" where plaintiff admitted that his employment was "at-will").

## Conclusion

For the foregoing reasons, the BOP was not a creditor of Correctional, and Defendant is not liable under the federal priority statute for the distribution of Correctional's assets. This court draws no conclusions as to the proper amount of assets attributable to each company or the amount of damages for which Defendant may be liable on other claims.

AN ORDER WILL ISSUE.